# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Siegel Development, LLC v. Peak Construction LLC**, 2013 IL App (1st) 111973

---

| | |
|---|---|
| Appellate Court Caption | SIEGEL DEVELOPMENT, LLC, an Illinois Limited Liability Company; ROSS SIEGEL; and GARY SIEGEL, Plaintiffs-Appellants, v. PEAK CONSTRUCTION LLC and PEAK PROPERTIES LLC, Illinois Limited Liability Companies; COLIN O. HEBSON; MICHAEL L. ZUCKER; ERIC BERNSTEIN; and MICHAEL OBLOY, Defendants-Appellees (842 Wood, LLC, an Illinois Limited Liability Company; Richard E. Lane; and Brad Court, Defendants). |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-11-1973, 1-12-0745 cons. |
| Filed | June 28, 2013 |
| Rehearing denied | July 24, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered for defendants in an action alleging that defendants engaged in a conspiracy to defraud plaintiffs in connection with the sale of a four-unit building for purposes of conversion into condominium units, since plaintiffs did not reasonably rely on the representations made by defendants, most of the representations, including the costs involved, were not actionable, and the record disclosed that there was no meeting of the minds as to the scope of the project, regardless of plaintiffs' contention that "a deal was in place." |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-11187; the Hon. Brigid Mary McGrath, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Donald L. Johnson and Julie A. Boynton, both of Donald L. Johnson, P.C., of Chicago, for appellants.

Stuart M. Nagel, of Chalmers & Nagel, P.C., of Chicago, for appellees.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion. Presiding Justice Lampkin and Justice Hall concurred in the judgment and opinion.

**OPINION**

¶ 1    The instant consolidated appeals concern a two-story four-unit building purchased by plaintiffs, Siegel Development, LLC, Gary Siegel, and Ross Siegel, for the purpose of converting the building into condominium units. Plaintiffs allege that they purchased the property in reliance on a promise from several of the defendants that defendant Peak Construction LLC would perform the renovations needed for the condominium conversion project for a price of $183,200. After closing on the purchase, Peak Construction, through defendant Michael Zucker, informed plaintiffs that it would be unable to perform the renovation work. Plaintiffs filed suit, claiming that defendants fraudulently induced them to purchase the property. The trial court granted defendants' motion for summary judgment on plaintiffs' fraud claims, finding that plaintiffs did not reasonably rely on defendants' representations and that most of the representations were not actionable. For the following reasons, we affirm.

¶ 2                              BACKGROUND[1]
¶ 3                              I. Parties
¶ 4    Plaintiff Siegel Development, LLC (Siegel Development), is an Illinois limited liability company, of which plaintiffs Ross and Gary Siegel are the members.

¶ 5    Plaintiff Gary Siegel is a licensed real estate agent employed by Coldwell Banker Residential Real Estate and the Matt Garrison Group, a real estate agency associated with Coldwell Banker, at the time of the transaction at issue. He has participated in four real estate transactions, not including the transaction at issue in the instant case, which includes: a 90% stake in a building purchased in 2000; a condominium unit purchased in 2002 and sold in 2005; a condominium unit purchased in 2006; and a building purchased on an undisclosed

---

[1]All facts arise from the verified complaint or the parties' discovery responses, including testimony from the 19 depositions contained in the record on appeal.

date. During his deposition, Gary[2] also testified that he owned his current home, which he purchased in 2008. Gary further testified that during his time at the Matt Garrison Group, Gary represented three buyers and two sellers in real estate transactions. When he represented the buyer, the agency was paid a commission of 2.5% by the seller, which was the standard in the Chicago real estate industry; Gary received a portion of the commission.

¶ 6    Plaintiff Ross Siegel graduated from the University of Wisconsin in 1997 with a bachelor's degree in accounting and passed the certified public accountant exam the same year. He became a licensed real estate agent in December 2005, but has never purchased or sold any properties as an agent. He has participated in four real estate transactions, not including the transaction at issue in the instant case, which includes: a 50% stake in a "2-flat," which was purchased in 1998 and sold in 2004; a townhouse used as a primary residence, purchased in 1999 and sold in 2005; a 33% stake in a one-story office building, purchased in 2004; and a house used as a primary residence, purchased in 2005. He also filed suit against the builder of the house purchased in 2005 on June 23, 2006, alleging that the house was set back 15 feet farther from the street than was provided for by the stamped, approved plans. Sam Borek, plaintiffs' attorney during the transaction at issue, opined that Ross "is an extremely bright individual with a very sophisticated tax and business background."

¶ 7    Defendant 842 Wood, LLC (842 Wood), is a member-managed Illinois limited liability company. Defendants Hebson and Lane are the members of 842 Wood. Only Hebson is a party to the instant appeal,[3] as the claims against Lane were dismissed with prejudice pursuant to a settlement agreement and 842 Wood was voluntarily dismissed without prejudice on February 23, 2010. In addition to being a member of 842 Wood, Hebson is an Illinois-licensed real estate agent for @properties.

¶ 8    Defendants Peak Construction LLC (Peak Construction) and Peak Properties LLC (Peak Properties) are manager-managed Illinois limited liability companies. Together with Peak Construction Development LLC (Peak Development), a manager-managed Illinois limited liability company, Peak Construction and Peak Properties are sometimes referred to as the "Peak entities."

¶ 9    Defendant Zucker is a property manager/partner with Peak Properties and is a partner in all three of the Peak entities. Zucker testified that defendant Michael Obloy (Obloy) is an employee of Peak Development whose role was "[f]inance," meaning "[d]ue diligence on deals." Defendant Eric Bernstein (Bernstein) was employed by Peak Properties in 2006, performing "spot jobs" as part of an "offset" that he described as "just a little separate

---

[2]We refer to Gary and Ross Siegel by their first names for the sake of clarity and collectively refer to them as the Siegels.

[3]According to the record, Hebson voluntarily filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois on November 4, 2010, while the motion for summary judgment in the instant case was pending. On July 12, 2011, the bankruptcy court approved Hebson's voluntary waiver of discharge and, on October 3, 2011, Hebson's bankruptcy case was closed without entry of a discharge.

company that Mike [Zucker] and I were in charge of." Bernstein explained: "I was working for Peak Properties. I was just, kind of, a subsidiary. So I came on to try to establish, you know, an offset of, kind of like, Peak Construction, just running–again, just running some projects and trying to bring in more income." Bernstein testified that Zucker was his supervisor.

¶ 10    Defendant Brad Court (Court) is an Illinois-licensed realtor associated with Coldwell Banker Residential Real Estate and the Matt Garrison Group. Court voluntarily filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois on February 12, 2008, and is not a party to the instant appeal.

¶ 11                        II. Transaction at Issue

¶ 12                 A. 842 Wood's Ownership of the Property

¶ 13    Colin Hebson, a real estate agent and member of 842 Wood, testified that, during the spring of 2006, he learned that a two-story, four-unit building located at 1025 N. Wood Street was for sale. After a walk through the property, Hebson decided to make an offer to purchase it; Hebson did not obtain a professional inspection because "[w]e were buying it to convert to condominiums or hold as an apartment and we felt that it was fine as it were [*sic*]." He and Lane purchased the property for 842 Wood, even though title to the property was placed in Lane's name.

¶ 14    Lane testified that he was the managing member of 842 Wood and that Hebson was the other member and Lane's business partner. Lane took title to the property in his name, but considered 842 Wood the owner. Originally 842 Wood was going to develop the property, but instead decided to sell it because there was a great deal of interest from potential buyers. As Lane's business partner, Hebson was authorized to sell the property if he located a buyer; Hebson was paid $20,000 for selling the property and also received 50% of the partnership distribution.

¶ 15    Hebson testified that after they purchased the property, he and Lane explored different opportunities for the property: "In real estate development, we run many different options at the same time. We'll look at selling to people after we purchased a building, we'll look at converting it [to] condos, we also look at keeping it as a rental building." Hebson and Lane obtained a rough estimate of the renovation costs they were considering undertaking, which was obtained from Bernstein in the form of a one-page spreadsheet; Bernstein indicated that the work in the rough estimate could be completed with a repair and replace permit.

¶ 16    Bernstein testified that the first time he visited the property, he was with Lane and Hebson, where Lane discussed the renovations that he envisioned; Hebson also supplied some ideas while they were walking through the property. Bernstein testified that the project was going to be a "lipstick job," meaning a remodel, as opposed to a "gut rehab," meaning "complete demolition, down to the shell." In order to complete a lipstick job, "[m]ost likely [the permit required] would be a repair or replace." Within the next week, approximately the end of May to beginning of June 2006, Bernstein provided Hebson with a spreadsheet containing a proposed budget based on their walk-through; the amount was approximately $183,000. Nothing happened with the proposal; Hebson testified that he and Lane decided

not to perform the renovations and instead sold the property.

¶ 17     The instant appeal revolves in large part around the spreadsheet provided to Hebson by Bernstein. Thus, we reproduce the spreadsheet in full:

| | | |
|---|---|---|
| DEMO | | $10,000.00 |
| ROUGH CARPENTRY | | $8,000.00 |
| FINISH CARPENTRY | | $7,000.00 |
| PAINTING | | $13,200.00 |
| TILE | | $3,500.00 |
| ROOF (SHINGLES) | | $8,000.00 |
| DECK | | - |
| INSULATION | | - |
| ELECTRIC | | $12,000.00 |
| HVAC | | $21,000.00 |
| PLUMBING | | $7,000.00 |
| DRYWALL | | $10,000.00 |
| CONCRETE | | $12,000.00 |
| WINDOWS | | $7,000.00 |
| SIDING/GUTTER/DOWN SPOUTS | | - |
| HARDWOOD FLOORS | | $18,000.00 |
| MASONRY | | $6,000.00 |
| DOORS | | $2,700.00 |
| K/B CABINETS | | $6,000.00 |
| APPLIANCES | | $12,000.00 |
| PLUMBING FINISH | | $3,000.00 |
| GC/SUPERVISOR FEE | | $15,000.00 |
| INSURANCE | | $1,800.00 |
| | TOTAL | $183,200.00 |

¶ 18     Hebson testified that he "had put the word out to some different people that [1025 Wood

was for sale as] an off-market deal." The affidavit of Joseph Zimmerman, a sales agent at @properties with whom Hebson had previously worked, stated that he signed an assignment and assumption of a real estate contract for the purchase of 1025 Wood on January 27, 2006. Zimmerman intended to purchase the property with other members of a limited liability company known as BSD LLC and to have BSD LLC hold title to the property. On February 9, 2006, Zimmerman terminated the assignment and assumption of real estate contract for reasons unrelated to the condition of the property.

¶ 19   Obloy, an employee of Peak Development at the time, testified that he first learned of 1025 Wood when Hebson informed him it was available for sale; Obloy knew Hebson because Peak Development had listed some projects that it had developed for sale through @properties, Hebson's employer. Obloy had been actively purchasing apartment buildings, and he believed that Hebson approached him for that reason. Obloy visited the property and observed that it "generally needed rehab" consistent with an apartment building that was 80 to 100 years old. Obloy submitted an offer to purchase the property for $625,000. Obloy intended to renovate the property to use for apartment rentals and estimated that it would cost approximately $200,000 based on his financial projections. Obloy canceled the offer during the attorney review period because he discovered that there was at least one long-term lease on the property.

¶ 20   Hebson testified that he also attempted to sell the property to a third person, whose name Hebson could not recall, but the deal did not go through.

¶ 21          B. The Siegels' Search for a Condominium Conversion Project

¶ 22   The complaint alleges that in February or March 2006, Gary informed Court that he was looking for a condominium conversion opportunity, which was to be Gary's first real estate project. Gary testified that Court was also an agent of the Matt Garrison Group, and was "showing [Gary] the business, going to teach [him] the ropes." Ross testified that Gary and Court had a "[s]eemingly pretty close" relationship; Court "basically help[ed] [Gary] out, help[ed] him learn the business" of being a real estate agent.

¶ 23   Ross testified that once Court learned that Gary and Ross were interested in investing in a real estate project together, Court told Gary that he had a building to show Gary. Gary testified that Court "was being a nice guy trying to help [Gary] out," but was also "going to play a major role in the resale of the units," bringing in buyers and receiving a commission. Likewise, Ross testified that he believed that Court was going to help them with their purchase of the property because he wanted to help sell the units upon completion of the project; Court never told Ross that he wanted to help sell the properties, but Ross thought he did "[b]ecause he is a realtor." Court also testified that he assumed that he would be one of the listing agents on the resold units if he was the one putting the project together, because "[t]hat's just how the real estate went down."

¶ 24   Obloy testified that Court called Obloy, who had met Court when Court acted as a listing agent for a property Peak Development developed, to inform him that a real estate professional was looking for a small condominium conversion project. Obloy called Hebson to ask him if he knew of any buildings for sale that would be suitable for the project. Hebson

informed Obloy that 1025 Wood was for sale. Obloy testified that he discussed compensation with Court; Court indicated that he wanted to receive a referral fee, and they agreed to split whatever the referral fee would be. Hebson informed Obloy that there would be a referral fee paid by the seller of approximately $20,000. Obloy did not inform plaintiffs that he or Court was being paid a fee.

¶ 25 Court testified that the project "was supposed to be an easy deal for somebody that was new; here's a building, here's all the stuff, here you go." Accordingly, the complaint alleges that in early June 2006, Court arranged a meeting between Gary, Hebson, and Obloy. At approximately the same time, Court obtained from Hebson an itemized cost spreadsheet prepared by Peak Construction, listing various proposed repairs and upgrades to the building totaling $183,200. Court gave a copy of the spreadsheet to Gary.

¶ 26 Gary testified that Court informed him that Hebson had done a number of deals with Court and that Hebson was "a big time real estate developer. He gets his hands on the best deals in the city. If I had any desire–which at that point I was starting to spend more and more time in real estate. If I had any desire to be successful, this is a guy that I really wanted to have on my side."

¶ 27 ### C. Meetings With Defendants

¶ 28 Since the parties disagree as to some of the representations made during the various meetings between them, where necessary, we set forth plaintiffs' version of events for each meeting, followed by defendants' version.

¶ 29 ### 1. June 7 Meeting and Signing of Purchase Contract

¶ 30 #### a. Plaintiffs

¶ 31 The complaint alleges that a meeting between Gary, Hebson, Court, and Obloy took place at 1025 Wood on June 7, 2006. At the meeting, Hebson told Gary that the building was " 'the perfect project' " for a first-time developer, with everything in place for a " 'huge' " return on investment. Hebson also told Gary that all the work necessary could be done after obtaining a "repair and replace" permit, instead of requiring other, more expensive, permits and that Hebson already had an arrangement with Peak Construction to perform all of the repair and remodeling work on the project. Hebson said, and Obloy confirmed, that the spreadsheet Gary received from Court was accurate and that all of the listed work was included in Hebson's construction contract with Peak Construction; the work and $183,200 price were "all agreed"; and Peak Construction was ready to begin work as soon as Gary closed on the purchase. Hebson explained that he had "done 'a ton' of similar projects previously" and would have converted 1025 Wood as well but was handling other, larger, projects.

¶ 32 Hebson walked through the building with Gary, informing Gary of what he could expect from the finished project, given the construction contract and pricing that Hebson had in place through Peak Construction. Hebson told Gary that he would be available throughout the project to assist Gary and would periodically visit the site to ensure that work was

proceeding according to the plan that Hebson and Bernstein had formulated.

¶ 33    Hebson said that Gary would be unable to obtain another deal like the one he was offering, with the rehabilitation and remodeling contract in place and at a favorable price, and that Gary needed to act quickly to accept the deal or else someone else would. Hebson and Court informed Gary that Hebson had other potential buyers who were ready and willing to purchase the building for a price of $700,000 or higher. However, Hebson was willing to sell the property to Gary "as a favor," with the Peak Construction repair and remodeling contract included as a "package."

¶ 34    Hebson informed Gary that the construction contract with Peak Construction had been created for Hebson, then offered to Obloy, who turned it down because of a conflict of interest arising from his responsibilities with Peak Construction; Hebson, Obloy, and Bernstein each explained to Gary that Hebson was an " 'important' " client of Peak Construction.

¶ 35    The complaint alleges that, "[w]hen Gary Siegel asked whether there were any unforeseen risks that a first-time developer should be aware of, Obloy and Hebson stated that, if Gary Siegel and Ross Siegel purchased the building, a 'huge' profit on the conversion to condominiums was almost guaranteed; the Siegels would have to really screw up to make only a small profit."

¶ 36    The complaint alleges that, "[i]n reliance on Hebson's and Obloy's representations, on their own behalf and on behalf of their respective principals, 842 Wood and Peak Construction," on June 13, 2006, Gary signed a contract to purchase the building for $680,000, with the right to assign the contact to a limited liability company. The next day, Hebson signed the purchase contract on behalf of 842 Wood, the seller. The purchase contract provided for an attorney modification period of 10 business days and a closing date of July 10, 2006. In July 2006, Gary assigned the purchase contract to Siegel Development. Gary testified that prior to closing, he visited the property between 8 and 12 times, half the time with Court accompanying him.

¶ 37                    b. Defendants

¶ 38    Obloy testified that he first met Gary when Obloy, Gary, Court, and Hebson visited the property together in June 2006. Obloy was present at the meeting because Court asked him to attend; he "was there to walk through the building and if anybody had any questions about condominium conversion developments, if [he] had an opinion." Obloy provided Court with the spreadsheet[4] containing his financial projections, but did not know whether the spreadsheet was given to Gary; Obloy changed the acquisition price in the spreadsheet from $625,000 to $700,000, because Hebson informed him that the property was being sold for that amount. They walked through the building, and Gary and Hebson were discussing Hebson's vision for the property. Obloy recalled that someone said "something to the extent

---

[4]Obloy's spreadsheet is not the same spreadsheet as that provided by Bernstein to Hebson and reproduced above.

-8-

[*sic*] of being a good project for a first-time project or a first-time developer." Hebson also mentioned that Peak Construction had previously indicated that it would be able to perform construction work on the property during discussions with Hebson. Hebson and Gary "talked in generalities about interior renovation, walking through the units, put a kitchen here, move this wall there."

¶ 39       Hebson testified that he met Gary, Court, and Obloy at 1025 Wood on June 7. Hebson informed Gary that Bernstein provided him with a rough estimate for some of the repairs and indicated that a repair and replace permit would suffice.

¶ 40                                     2. June 15 Meeting

¶ 41                                      a. Plaintiffs

¶ 42       The complaint alleges that, on June 15, 2006, plaintiffs met at 1025 Wood with Hebson, Court, and Bernstein. During the meeting, Hebson reiterated that the repair and remodeling contract with Peak Construction was in place, with Peak Construction to receive $183,200 for the work, with the work to begin immediately after closing. Bernstein said that "he stood behind whatever Hebson said regarding the proposed [construction] contract with Peak Construction, and Hebson said he stood behind Bernstein's representations as well." "[T]his assurance by Bernstein was considered crucial by Gary Siegel and Ross Siegel, because the $183,200.00 'deal' with Peak Construction made the project much more attractive to them than it otherwise would have been."

¶ 43       Bernstein informed plaintiffs that he had walked through the building several times with Hebson and that he and Hebson had a clear and mutual understanding of what the finished product would be. Bernstein and Hebson told plaintiffs that there was "no need" for plaintiffs to hire a professional inspector to inspect the property, because " 'everything' " would be replaced and because an inspector would not find any additional information without "ripping up" the walls, floors, and ceilings, which would only create more work for Peak Construction and additional expense for plaintiffs. Bernstein assured plaintiffs that the structure of the building was "sound" and that the sloping of the floor would be fixed when the floors were replaced as part of the work included in the Peak Construction contract. Hebson and Bernstein indicated that the proposed work was within the scope of a repair and replace permit issued by the City of Chicago, and that they had frequently undertaken this type of project with that type of permit. Hebson and Bernstein "described it as a 'lipstick' project rather than a 'gut' rehab." They actively discouraged plaintiffs from consulting with others about the project, repeatedly saying that they were the experts, having previously completed many of the same type of project.

¶ 44       Plaintiffs asked what would happen if, after purchasing the building, they were unable to proceed with the conversion for some reason, and Hebson replied that they would still be able to resell the building for " 'well over $700,000.00.' " Hebson assured plaintiffs that if Bernstein or Peak Construction did not follow through, Hebson would "get involved."

¶ 45       Ross testified that the first time he visited the property was on June 15, 2006, when he and Gary met Hebson, Court, and Bernstein and walked through the property; by that point, Gary had already signed a contract to purchase the property. Hebson led the walk-through

and pointed out everything that was going to be done pursuant to the construction agreement that Peak Construction had created for him.

¶ 46                                 b. Defendants

¶ 47    Hebson testified that he met the Siegels and Bernstein at 1025 Wood on June 15 so that Ross could walk through the property; he could not recall whether Obloy or Court was also present. During the meeting, Hebson and Bernstein discussed that the spreadsheet was a rough estimate for work at the property.

¶ 48    Bernstein testified that the meeting with Court, Hebson, Ross, and Gary at the property in the middle of June 2006 was the first time he met Gary or Ross. He believed that the Siegels had a copy of the spreadsheet he had provided to Hebson because, by the time they next met, the Siegels were aware that the price was going to be $183,200. Bernstein and Hebson discussed with the Siegels that the slope of the floor was going to be repaired and the roof would be replaced. After the first visit, Bernstein gave plaintiffs "our proposal," and set up a meeting at the Peak Properties office.

¶ 49                               3. June 20 Meeting

¶ 50                                 a. Plaintiffs

¶ 51    The complaint alleges that, on the morning of June 20, 2006, plaintiffs met with Zucker and Bernstein at Peak Construction's offices, where Zucker and Bernstein provided plaintiffs with a draft construction contract for Peak Construction's expected work at the building site, with a total price of $183,200, and including as an attachment the spreadsheet that Court had earlier provided Gary. Zucker and Bernstein informed plaintiffs that the terms of the draft construction contract were agreed to by Peak Construction. Zucker informed plaintiffs that he would soon visit the property to familiarize himself with it and that he would follow the progress of Peak Construction's work on the project; Zucker also indicated that he "stood behind everything Bernstein said or did."

¶ 52    During that meeting, a woman whom Bernstein identified as Peak Construction's " 'permit expediter' " came into the room, and after Bernstein reviewed the project with her, she told plaintiffs that a repair and replace permit would be sufficient for the project.

¶ 53                                 b. Defendants

¶ 54    Zucker testified that the first time he met the Siegels, they were meeting in a conference room and Bernstein asked Zucker to stop by, which he did for 10 minutes. Bernstein testified that, during the meeting, a permit expediter entered and Zucker stated that she would be the person dealing with the regulatory issues in terms of obtaining permits; Bernstein was not involved with the permit expediter on a day-to-day basis.

¶ 55    Bernstein testified that at the meeting at Peak Properties' office, Bernstein and Zucker gave the Siegels a copy of their construction contract. The price of $183,200 was listed in the construction contract, as was an estimated start date of July 10, 2006. The Siegels expressed interest in moving forward and Bernstein agreed to connect them with an architect. The

Siegels did not sign the construction contract at that time because they wanted their attorney to review it.

¶ 56                              4. June 21 Meeting with Bernstein and Architect

¶ 57                                        a. Plaintiffs

¶ 58      The complaint alleges that on June 21, 2006, Gary and Bernstein met at 1025 Wood, where Bernstein again confirmed that Peak Construction would begin the repair and remodeling work within three days after the closing, expecting that it would take two to three days to obtain the permit before work could begin. At the same meeting, Gary and Bernstein met with an architect, who walked through the building to review the project. The architect expressed concern about the project and proposed work requiring full permits. Later, outside the presence of the architect, Bernstein told Gary that the architect was only concerned about obtaining more work for himself and that Gary should request a more basic proposal from the architect. Bernstein also repeated that he had done similar projects many times with only a repair and replace permit, that there was no need to obtain a full permit, and that Gary had nothing to worry about. Bernstein promised to speak with the architect and have the architect prepare basic plans.

¶ 59      Ross testified that Gary met with the architect, who sent a proposal on June 26. Ross emailed Bernstein on June 27, stating that after receiving the proposal, he and Gary "ha[d] a bunch of questions"; Ross did not discuss the architect's proposal or the architect's concerns about the permits with his attorney. Ross testified that "we were comfortable" with Bernstein's response to the architect's concerns, which was "[t]hat, basically, [Bernstein] had done numerous projects exactly like this in the past and that repair and replace he had worked under and that [the architect] was probably just looking to try and increase the cost of his services."

¶ 60                                        b. Defendants

¶ 61      Bernstein testified that he visited the property once with the Siegels and L. Jean DuFresne, an architect whom Bernstein referred the Siegels to because they wanted someone to "draw up some plans." Bernstein testified that when they were walking through the property, "[t]here were certain things that the Siegels were requesting. They were asking, I know, if they could put in stairs here, if we can move a wall here, if there was electric, new services, putting on decks, incorporating some other space into other units. It was significantly different than what my original proposal was because what I wanted and what Lane and Hebson had originally–what we had gone through was, again, just a remodel job. It wasn't a complete gut rehab." Bernstein testified that the Siegels were discussing additions that were not included in the $183,200 proposal.

¶ 62      The record on appeal contains several emails between plaintiffs and L. Jean DuFresne, an architect with SPACE Architects + Planners, that were attached to defendants' motion for summary judgment. One email, dated June 26, 2006, contained a proposal for architectural services. The proposal noted that "[t]he current structure is in great shape," but stated: "Due to the nature of the work, you will be required to get a permit from the City of Chicago

-11-

Department of Construction and Permits, the City Hall location, before starting the work." The next day, Ross replied to the email: "Perhaps there was a miscommunication, but what Gary and I are looking for is simply floor plans to facilitate the construction for a repair and replace permit–I think just number 6 in your list. It looks like your proposal is for a full permit and a significantly greater project." DuFresne replied the next day: "Due to the scope of the work that was outlined in the field by Eric [Bernstein] and Gary, you will have to apply for a full building permit. Repair and replace allows for very limited work within an existing building." DuFresne's email also provided a link to the City of Chicago website outlining the situations where a permit was needed.

¶ 63                    5. No Inspection and Purchase Contract Rider

¶ 64        In their requests to admit, plaintiffs admitted to the accuracy of certain email communications between them and their counsel. One set of emails was between Ross and Marc Engel, plaintiffs' counsel at the time, and concerned a proposed rider to the purchase contract; the email from Engel concerning the rider included a question from Engel as to whether the Siegels were planning on having the property inspected. In an email dated June 21, 2006, Ross made a comment concerning the rider that "we are not going to do an inspection." In a reply, dated June 24, 2006, Engel included the comment: "Also, are you sure that you don't want to have a professional inspection done–to look at the foundation and structural integrity of the building?" Ross responded on June 25, 2006: "We are not going to have an inspection done. I appreciate your concern, but after discussing it with the inspector and the GC, we will take a pass."

¶ 65        The email "ask[ing] Ross whether or not he wanted to have a professional inspection done to look at the foundation and structural integrity of the building" was provided by Engel, and was the only document produced by Engel, which Engel saved despite moving to a different law firm "[i]n the event I was ever deposed and for purposes of litigation." Engel testified that he represented the Siegels in their purchase of the property; he was an associate with the firm, supervised by Sam Borek. Engel opined that, by purchasing the property without having a professional inspection, plaintiffs were taking a risk of latent defects in the property.

¶ 66        Gary testified that, if a buyer asked him whether he or she should have an inspection, he would tell them yes, depending on the circumstances; Gary opined that an individual would not need an inspection for a "[n]ew construction or a condo conversion. Or if they were educated enough on their own to make their own inspection." Gary further testified that he and Ross did not have the property inspected "[b]ecause Bernstein and Hebson, they all thought it was a bad idea because an inspection would be invasive and cause more work. And the issues that we thought were going to come up, they said they are not issues."

¶ 67        Luke Fonash, a real estate agent with the Matt Garrison Group at the same time as Gary, testified that "I don't know anyone in their right mind that would buy a property and waive inspection. I don't care if it's a $50,000 condo or a $12 million mansion." Fonash further testified that no matter the type of property, he would never advise a buyer to purchase a property without an inspection "[b]ecause that's not how you do it. That's [the] number one

-12-

rule." Fonash visited the property four to five times with Gary. The first time he visited the property, he observed that the building was "definitely something that needed to be refurbished." He did not notice any particular problems with the building, other than the floor sloped. Fonash testified: "Gary purchased a property, didn't do the due diligence, waived inspection. It turned out the building didn't come to what he wanted to do with it and now we are all sitting here."

¶ 68 Borek testified that he generally advised clients to have an inspection because "I just think it makes good sense to have a good understanding of the condition of the property if the developer isn't qualified in the same manner that the inspector is." When Borek learned that the Siegels were not planning on having an inspection, "[m]y response was that[,] when I was told they weren't going to do an inspection[,] that they didn't need one because they had the information from the general contractor, that they had met with the general contractor and that he had communicated to Ross and to Gary all of the information that an inspector would be provided if they were to hire a different one."

¶ 69 The complaint alleges that, on July 6, 2006, plaintiffs' attorney faxed a letter and a proposed purchase contract rider to 842 Wood's attorney. The rider contained various contract modifications, including extension of the closing date to July 31, 2006, and addition of a warranty from the seller to the buyer that "[t]he roof, walls, and foundation of the building on the premises will not allow any water leakage and will be in good working condition on the date of closing." The rider was signed on behalf of 842 Wood on July 10, 2006.

¶ 70                  6. July 17 and 26 Meetings and Plaintiffs'

Proposed Construction Contract

¶ 71 The complaint alleges that, on July 17, 2006, Gary met with Bernstein at 1025 Wood. They discussed the timing, materials, pricing, and other details of the proposed construction contract between Peak Construction and plaintiffs for repair and remodeling of the building. Bernstein again assured Gary that everything was agreed as set forth in the draft construction contract and that Peak Construction would begin work within a few days of the closing. At the same meeting, Gary and Bernstein met with a representative from a remodeling design firm as part of the process of preparing new floor plans for the remodeling work. Gary and Bernstein agreed that Bernstein would make a few changes to the plans.

¶ 72 Engel testified that he used the figures in Peak Construction's construction proposal for work on the property to draft a construction contract "[j]ust to provide some more details or provisions to fine-tune, perhaps, agreement between the parties." Engel explained: "This document just has work, and it has figures, but it doesn't have contract language." Engel testified that there were changes between Peak Construction's proposal and the construction contract he prepared, but that there was no change to the list of items that were to be repaired or to the price.

¶ 73 Engel opined that the construction proposal from Peak Construction was not a contract, because it was not signed and "[n]othing is certain until it's signed." Borek testified that he asked Engel to draft the construction contract in anticipation of using it, but was later

-13-

informed by Ross that it would not be necessary "because they already had an agreement that they were going to use which was the same agreement that the general contractor had with the seller."

¶ 74    The complaint alleges that, on July 26, 2006, plaintiffs met with Bernstein at 1025 Wood to discuss final construction details and to sign the construction contract between plaintiffs and Peak Construction. They agreed that the start date for the work would likely be August 3 or 4, but no later than August 7, 2006. They walked through the building again and confirmed the previously-agreed contract terms for the repair and remodeling work. Bernstein said that he wanted to review the construction contract again prior to signing it, so plaintiffs and Bernstein agreed to meet again at 9:30 a.m. on August 1, 2006, the day after the closing, to sign the construction contract for Peak Construction to perform the repair and remodeling work.

¶ 75                                                    D. Closing

¶ 76    The complaint alleges that, "in reliance on the representations by Hebson, Court, Obloy, Bernstein, Zucker, 842 Wood and Peak Construction," plaintiffs closed on the purchase of 1025 Wood on July 31, 2006. The warranty deed conveying the property to Siegel Development was signed by Lane. Following the closing, either 842 Wood or Hebson paid Court $10,000 in cash for his role in facilitating the transaction, a payment that was not listed on the HUD-1 Settlement Statement for the closing.

¶ 77    Engel testified that he was the attorney representing the Siegels at closing, and he was not aware at that time whether there was a signed construction contract with Peak Construction. Engel testified that he did not feel it was important to determine whether there was a signed construction contract prior to closing: "My general feeling was that they were going to do the work either before or after closing, and they would execute a contract to have work done."

¶ 78    Ross testified that he knew that Peak Construction had not signed the proposed construction contract but proceeded to close on the property regardless. Ross testified that he and Gary "weren't concerned about" the fact that Peak Construction had not signed the proposed construction contract because they "had a deal in place" that "was discussed with all the defendants numerous times."

¶ 79    The complaint alleges that, at approximately 8:30 p.m. on July 31, 2006, Bernstein called Gary to cancel their August 1 meeting, informing Gary that he was not ready to sign the construction contract because he needed to review some details of the proposed construction contract with Zucker. The phone call was the first notice that plaintiffs had received that Peak Construction had not fully agreed to the terms of the proposed construction contract. Over the next 10 days, Gary repeatedly attempted to call Bernstein and told Court in person that he was attempting to contact Bernstein; Gary asked Court for his assistance in contacting Bernstein and in finding a new buyer for the building, which Court had previously said existed. Bernstein never answered the phone or returned Gary's calls. Court never provided the names of any new buyers for the building and, on approximately August 14, 2006, informed Gary that Court was "done with the matter and was no longer involved."

¶ 80    Bernstein testified that he did not return the Siegels' phone calls in early August because "at that time I didn't have an answer for them." Bernstein knew their closing was at the beginning of August, and attempted to set up a meeting "because there was so many changes and so many questions, I was trying to put it all together"; however, unbeknownst to him, Zucker had gone out of town at the end of July. The Siegels wanted the signed construction contract, but Bernstein could not provide it because Zucker had gone out of town and would not return until the middle of the first week of August; Bernstein did not have the authority to sign the construction contract but needed Zucker.

¶ 81    Gary testified that, approximately a week after the closing, Court informed him that Court had received a $10,000 payment in connection with the sale of the property; Gary also heard people at the office discussing it. Court testified that he received $10,000 from Hebson in connection with the sale of the property. He did not explicitly inform the Siegels of the payment, but believed that they knew, since they were not paying him and "[w]hen there's property not on the market, somebody is paying the guys putting it together. *** If I wasn't getting paid by them, then the Siegels were going to have to pay me."

¶ 82    The complaint alleges that Gary was eventually able to contact Zucker, who arranged a meeting at 1025 Wood on August 10, 2006, between plaintiffs and Zucker, Bernstein, and an unnamed employee of Zucker. During the meeting, Zucker stated that he supported everything that Bernstein had told plaintiffs about the construction contract and the project, but wished to examine the contract pricing and other terms, requesting a few days to do so. At that time, Zucker also walked through the property with plaintiffs.

¶ 83    Zucker testified that he met the Siegels at 1025 Wood, along with Bernstein and another contractor who "tag[ged] along," in order to discuss the scope of the project. They walked around the building and the Siegels pointed to specific renovations they wanted done "such as [they] want to do this electric work, move this wall, put steps here, put a new kitchen here; so that gene[r]ic type of talk." Zucker testified that the projects the Siegels were proposing went beyond the "guesstimate" provided by Bernstein's spreadsheet. Bernstein testified that Zucker determined that "based on the scope of work, the changes that were occurring that the Siegels had wanted, that there was just no way that we could do the project for" $183,200. Gary objected, and Zucker said that he would need to get back to him. Zucker and Bernstein ultimately concluded that they could not perform the work for that price.

¶ 84    The complaint alleges that, on August 14, 2006, Zucker called Ross and informed him that Peak Construction could not agree to the $183,200 price in the draft construction contract and could not agree to perform the work under a repair and replace permit. Ross told Zucker that this information significantly changed the costs and timing of the project, which were important in plaintiffs' decision to purchase the property. Ross told Zucker that plaintiffs wanted the package that had been repeatedly presented to them, but Zucker "said he would not do anything."

¶ 85            E. The Siegels' Post-Peak Construction Efforts
                        to Renovate the Property

¶ 86    The complaint alleges that, on August 15, 2006, Ross sent an email to Hebson, stating

that plaintiffs were interested in quickly reselling the building and asking for the names of the other people who Hebson had indicated were interested in buying the property; Hebson did not respond to the email.

¶ 87    In mid- to late August, Gary informed Court that plaintiffs "wanted to get out" of the project. Court promised to speak with Hebson and Obloy, but plaintiffs never learned of the results of the discussion. In the last week of August, Gary attempted to call Obloy and left Obloy a voicemail asking for assistance concerning the property. Obloy returned the call approximately five weeks later, but offered no assistance. The same day Gary called Obloy, he also called Hebson and left a voicemail asking for assistance with the property and asking to be put in touch with other potential buyers for the property; Hebson never returned the call.

¶ 88    In late August and early September, plaintiffs were informed by contractors and a structural engineer who visited the building that there were structural problems with the building, including that the foundation was sinking in places; the walls were bowing out, especially in the attic; the floors were sloping around the major supports; and the roof needed to be replaced. Earlier, in June and July 2006, Hebson, Obloy, Bernstein, and Zucker had failed to mention to plaintiffs that there were any problems with the foundation, walls, or other structural components of the building; in fact, Hebson and Bernstein had specifically denied that there were any structural problems.

¶ 89    On September 7, 2006, plaintiffs received a quote of $425,000 from a contractor to perform the repair and remodeling work on the project, which did not include roof repairs or necessary structural repairs to the foundation, walls, and floors. They also received a separate quote of $17,000 for roof repairs. Plaintiffs were unable to obtain a quote for the necessary structural repairs without an engineer performing an invasive investigation.

¶ 90    Jason Patrinos testified that he operated a real estate management business and purchased the property from the Siegels in December 2007, where he renovated it for use as rental properties. Patrinos, through his company, acted as general contractor, and Patrinos performed the plumbing and demolition work on the property. Patrinos did not pay himself for the general contractor duties and did not perform structural repairs. Patrinos' affidavit also provided that Patrinos replaced the roof, repaired the exterior masonry walls, repaired the sloping of the floors, and performed a general rehabilitation of the property to make the building's existing units into four salable units. The renovations were completed at a total cost of $234,500, and all four units were being rented to tenants as of the August 20, 2009, date of the affidavit.[5]

¶ 91                                        III. Complaint

¶ 92    On October 24, 2006, plaintiffs filed a four-count verified complaint against defendants, which was amended on July 24, 2007. Counts I and II, the counts at issue in the instant appeal, allege conspiracy to defraud and fraud, respectively.

---

[5]The record indicates that all four units were sold between October 2009 and April 2010.

¶ 93    Count I of the complaint alleges that the conduct of defendants was part of a conspiracy to defraud plaintiffs in order to sell the property for a price substantially in excess of its fair market value. As part of the conspiracy, Hebson, Bernstein, Obloy, and Zucker knowingly made false representations, including statements (1) that the only repairs or remodeling required on the building for a successful condominium conversion were included on the spreadsheet provided to Gary by Court; (2) that the roof, walls, and foundation of the building would not allow water leakage and would be in good working condition on the date of closing; (3) that Peak Construction was willing to perform the work listed in the spreadsheet and referenced in the draft construction contract for a total price of $183,200; and (4) that a repair and replace permit would authorize the performance of all of the necessary repair and remodeling work. At the time the statements were made, Hebson, Bernstein, Obloy, and Zucker knew their representations to plaintiffs were false and intended that plaintiffs rely on those representations. Plaintiffs relied on defendants' representations in deciding to purchase the property and in closing on that purchase. As a result of the conspiracy to defraud, plaintiffs were damaged in that they purchased the property for a price substantially in excess of its fair market value and became owners of a property that could not be converted into condominiums in such a way as to afford plaintiffs a return on their investment. Plaintiffs were also damaged in that they incurred substantial costs in purchasing and continuing to own the property, including interest, taxes, and other expenses. Accordingly, plaintiffs requested an award of compensatory damages of no less than $500,000, punitive damages of no less than $1 million, and an award of all costs incurred by them in the action.

¶ 94    Count II of the complaint is against 842 Wood, Peak Construction, Hebson, and Bernstein, and alleges fraud, repeating the same allegations as count I of the complaint and requesting the same relief. Counts III and IV of the complaint, not at issue on appeal, are against 842 Wood; count III is for breach of the purchase contract and count IV is for rescission.

¶ 95                    IV. Motion for Summary Judgment

¶ 96    On September 10, 2010, defendants Hebson, Zucker, Obloy, Bernstein, Peak Properties, and Peak Construction filed a joint motion for summary judgment on counts I and II of plaintiffs' amended complaint. The motion claimed that the undisputed facts proved that plaintiffs were sophisticated businessmen who were aware of the property defects they claim they were deceived about prior to the closing and nevertheless proceeded to close on the property, against the advice of counsel and without obtaining a professional inspection or a written executed construction contract with Peak Construction. Accordingly, the motion claimed that plaintiffs did not reasonably rely on defendants' representations but instead took a known risk that turned out badly.

¶ 97    The motion further claimed that defendants were entitled to summary judgment because the alleged false statements were puffery or opinions regarding future events and could not constitute actionable fraud, nor did the alleged undisclosed commission to Court and Obloy. Additionally, the motion claimed that the alleged misrepresentations did not cause any

-17-

damages, as plaintiffs received the full benefit of their bargain under the real estate contract for the purchase of the property, demonstrated by the fact that the appraised value of the property at the time of the purchase was $680,000, which is the price that plaintiffs paid. Finally, the motion claimed that there was no conspiracy to fraudulently induce plaintiffs to purchase the property.

¶ 98    In their response to defendants' motion for summary judgment, plaintiffs claimed that the facts demonstrated that defendants knowingly and intentionally acted in concert to defraud plaintiff and made actionable misrepresentations that plaintiffs relied upon in purchasing the property and that caused them damage. Plaintiffs further argued that, at a minimum, there were genuine issues of material fact that precluded summary judgment.

¶ 99    On April 1, 2011, the parties came before the trial court for a hearing on the motion for summary judgment and, on June 21, 2011, the trial court entered summary judgment on counts I and II of the complaint in favor of Peak Construction, Peak Properties, Zucker, Obloy, and Bernstein; Hebson was in bankruptcy at the time. The court stated that "the major premise underlying the fraud claim is that at the time the plaintiffs agreed to buy the property, they believed they were getting a package deal for construction from Peak Construction." However, the court noted that the purchase agreement for the property did not reference a package deal or any repair work, and the spreadsheet, "which is really the lynchpin underlying the fraud theory," was very general, containing only categories of work and round numbers. The spreadsheet also did not indicate anything about the scope of the repairs, leaving the question of whether it was to be a lipstick job requiring a repair and replace permit or a gut rehab requiring a full permit. The court noted that plaintiffs were provided a construction contract from Peak Construction that totaled $183,200, but that plaintiffs' attorneys prepared another construction contract in response; neither contract was executed. The court observed that "[i]n looking at all of this, I think the problem I see is that the defendants [*sic*] are attempting to enforce a contract through a claim for fraud."

¶ 100    The trial court disagreed with plaintiffs' argument that they believed they had an enforceable oral construction contract and that no written contract was necessary. The court pointed out that plaintiffs did not sign the Peak Construction contract but instead proffered their own contract. The court further noted that nobody had been able to testify as to the specific work the parties agreed was to be performed–"that is, the terms of the contract." Thus, the court found that there was no meeting of the minds sufficient to create an oral or written contract "and that permeates the claim for fraud *** as well."

¶ 101    The trial court found that, while the issue of reasonable reliance was normally a question of fact, under the facts of this case, there was no reasonable reliance as a matter of law. The court cited *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006, 1018 (2007), for the proposition that "if the purchaser's reliance is unreasonable in light of the information open to him, which includes the fact that there was actual knowledge in any, he might have discovered, by the exercise of ordinary prudence, the loss is considered his own responsibility and summary judgment against the purchaser is required because no fair-minded person could find otherwise."

¶ 102    The trial court noted that the transaction was an arm's-length transaction and that

plaintiffs chose not to obtain an inspection because they claim defendants told them it was not necessary since the property would be renovated. However, a licensed real estate agent visited the property and believed that an inspection was warranted, and plaintiffs were not discouraged from hiring an architect to go through the property. Nevertheless, they ignored the architect's advice that, due to the scope of work, a full building permit was required and the inclusion of the internet link to the City of Chicago website. The court concluded, "[a]ll of this evidence shows that there is no genuine issue of material fact that the plaintiffs took a known risk when they ultimately closed on the property." The court noted that while there was an issue of fact as to whether defendants discouraged plaintiffs from following through with the inspection or following the architect's advice, "there is no issue of fact that the defendants did not prohibit them from doing so, and that's an important distinction." The court pointed to the case of *Smith v. Ethell*, 144 Ill. App. 3d 171 (1986), stating that "the gist of the case is *** that it is at an arm's length transaction that's so long and the purchasers aren't prohibited by the sellers from undertaking further investigation, that it does not go to the issue of reasonable reliance."

¶ 103    The trial court also found that, in addition to the lack of reasonable reliance, most of the false statements were not actionable. The court noted that the statements regarding the potential of the property were puffery. The court further noted that, as to the claim that the only repairs necessary were those on the spreadsheet for $183,200, the spreadsheet was "too vague" about what repairs were required and there was no evidence that the $183,200 number was false. The court found that the representation as to the type of permit required may or may not have been false, but the type of permit required was an opinion of law, and plaintiffs could have discovered any inconsistency by reviewing the applicable building and zoning ordinances that they were directed to by the architect.

¶ 104    Finally, the court found that there was no reasonable reliance as to statements concerning the structural elements–that the foundation, the roof, and the walls were sound and did not leak. The court found that plaintiffs, instead of relying on the statements made by defendants, obtained warranties from the seller as to those elements. The court concluded: "I thought about it long and hard and it may be that there was some–may be have been–you know, led down a path, but I just don't think it got to the point where it was actionable."

¶ 105    On February 22, 2012, the trial court entered summary judgment as to counts I and II of the complaint in Hebson's favor, for the reasons stated in granting summary judgment in favor of the other defendants.

¶ 106    Plaintiffs filed notices of appeal for both cases, and we consolidated the appeals on March 30, 2012.[6]

¶ 107                              ANALYSIS

¶ 108    On appeal, plaintiffs claim that the trial court erred in granting summary judgment in defendants' favor because the evidence established that they were defrauded by defendants

---

[6]We note that Hebson has not filed an appearance in the matter.

or, at a minimum, genuine issues of material fact precluded the entry of summary judgment. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2004). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 109    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. "Mere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In other words, there is no evidence to support the plaintiff's complaint.

¶ 110    " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). " 'To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim.' " *Schrager*, 328 Ill. App. 3d at 708 (quoting *Luu*, 323 Ill. App. 3d at 952). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 111    To state a claim for fraud, a plaintiff must allege five elements: "(1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance." *State Security Insurance Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 592 (1994) (citing *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (1980)).

¶ 112    In the case at bar, plaintiffs state that "[a]t the heart of the fraud claims in this case was the representation made by the defendants to the plaintiffs that the transaction was a package deal[,] namely[,] the purchase of Property and an agreement for the Property to be rehabbed at a cost of $183,200." Plaintiffs' amended verified complaint indicates that these alleged misrepresentations made by defendants fall into four categories: "[1] that the only repairs or remodeling required on 1025 N. Wood for a successful condominium conversion were included on the spreadsheet that Court provided to Gary Siegel (as Hebson, Bernstein, Obloy and Zucker repeatedly represented); [2] that the roof, walls and foundation of the building

will not allow water leakage and will be in good working condition on the date of closing (as made by Hebson on behalf of 842 Wood in the [purchase] contract Rider); [3] that Peak Construction was willing to perform all the work listed in the spreadsheet, and referenced in the draft [construction] contract, for a total price of $183,200.00 (as Hebson, Bernstein, Obloy and Zucker repeatedly represented); and [4] that a 'repair and replace' permit from the City of Chicago would authorize the performance of all of the necessary repair and remodeling work at 1025 N. Wood, among other misrepresentations." We agree with the trial court's conclusions concerning all four categories of statements.

¶ 113    With regard to the defendants' alleged misrepresentations concerning the spreadsheet, which the trial court noted were "really the lynchpin underlying the fraud theory," we agree with the trial court that there was no meeting of the minds concerning the work to be performed on the property. The spreadsheet itself was vague and only described broad categories of renovations, affixing a round-number estimate to each category. For instance, one line provides for "WINDOWS" for "$7,000.00," while another provides for "DOORS" for "$2,700.00." Plaintiffs point to the several walkthroughs of the property and claim in their brief that "it was not just the spread sheet that formed the [construction] contract but the spread sheet and discussion which were had which formed the contract." However, despite plaintiffs' argument, neither Gary nor Ross was able to provide very many details about the scope of the work during their deposition testimony. Additionally, as the trial court noted, when provided with a written construction contract, the Siegels did not sign it and knowingly closed on the property without a signed construction contract. Accordingly, we cannot agree with plaintiffs that there was a "deal in place" at the time of the closing. See *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 314 (1987) ("The essential terms of a contract must be definite and certain in order for a contract to be enforceable."). Since there was no definite agreement in place as to the scope of Peak Construction's work and plaintiffs never formalized an agreement with Peak Construction as to the scope of the work, there cannot have been a "false statement of material fact" about Peak Construction's willingness to perform the work that would form the basis of a fraud claim and the trial court properly granted summary judgment in defendants' favor regarding the claims concerning the spreadsheet.

¶ 114    With regard to the permit issue and the questions of the property's structural integrity, we agree with the trial court that plaintiffs' reliance on defendants' alleged misrepresentations was not reasonable. As part of its fraud claim, a plaintiff must show that its reliance on the misrepresentation was justified. *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 125 (1995). In other words, the reliance must be reasonable. *In re Marriage of Broday*, 256 Ill. App. 3d 699, 703 (1993). Generally, the question of whether a plaintiff's reliance was reasonable is a question of fact; however, where only one conclusion can be drawn from the undisputed facts, the question becomes one for the court to determine. *Doe v. Dilling*, 371 Ill. App. 3d 151, 174 (2006) (citing *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 575 (1998)). "In determining whether reliance was justifiable, all of the facts which the plaintiff knew, as well as those facts the plaintiff could have learned through the exercise of ordinary prudence, are taken into account." *Adler*, 271 Ill. App. 3d at 125. " '[A] person may not enter into a transaction

with his eyes closed to available information and then charge that he has been deceived by another.' " *D.S.A. Finance Corp. v. County of Cook*, 345 Ill. App. 3d 554, 561 (2003) (quoting *Chicago Export Packing Co. v. Teledyne Industries, Inc.*, 207 Ill. App. 3d 659, 663 (1990)). However, " 'Illinois law has long held that, where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation, even though the means of investigation were within the reach of the injured party and the parties occupied adversary positions toward one another.' " *Schrager*, 328 Ill. App. 3d at 709 (quoting *Sims v. Tezak*, 296 Ill. App. 3d 503, 511 (1998)). "If the party's reliance is unreasonable in light of the information open to him, the loss is considered his own responsibility." *D.S.A. Finance*, 345 Ill. App. 3d at 561 (citing *Neptuno*, 295 Ill. App. 3d at 575).

¶ 115     In the case at bar, we agree with the trial court that plaintiffs' reliance on defendants' statement that a repair and replace permit would suffice was not reasonable. Prior to the closing, plaintiffs received an architectural proposal from DuFresne that noted that "[t]he current structure is in great shape," but specifically stated that, "[d]ue to the nature of the work, you will be required to get a permit from the City of Chicago Department of Construction and Permits, the City Hall location, before starting the work." The next day, Ross replied to the email: "Perhaps there was a miscommunication, but what Gary and I are looking for is simply floor plans to facilitate the construction for a repair and replace permit–I think just number 6 in your list. It looks like your proposal is for a full permit and a significantly greater project." DuFresne replied the next day: "Due to the scope of the work that was outlined in the field by Eric [Bernstein] and Gary, you will have to apply for a full building permit. Repair and replace allows for very limited work within an existing building." DuFresne's email also provided a link to the City of Chicago website outlining the situations where a permit was needed. Thus, prior to closing, plaintiffs were informed by a professional that repair and replace permits would not be sufficient for the renovations they were planning. Even if, as Ross testified, "[the Siegels] were comfortable" with Bernstein's response "[t]hat, basically, [Bernstein] had done numerous projects exactly like this in the past and that repair and replace he had worked under and that [the architect] was probably just looking to try and increase the cost of his services," they were on notice that their planned renovation might not proceed as they had expected and should have investigated further.[7] Accordingly, the trial court property granted summary judgment in defendants' favor on the statements concerning the type of permit required.

¶ 116     Additionally, we agree with the trial court that there was no reliance on defendants' representations concerning the structural integrity of the property. Plaintiffs obtained a rider to the purchase contract in which 842 Wood warranted that "[t]he roof, walls, and foundation of the building on the premises will not allow any water leakage and will be in good working condition on the date of closing." Consequently, there need not have been a reliance on

_____

[7]We also agree with the trial court's comment that statements as to what permit was required are representations of law, not fact.

defendants' oral statements concerning the structural integrity of the property when it was warranted in the purchase contract. Moreover, plaintiffs did not have the property inspected prior to closing, although they were entitled to do so and their counsel specifically asked them, "are you sure that you don't want to have a professional inspection done–to look at the foundation and structural integrity of the building?" Thus, the trial court properly granted summary judgment in defendants' favor on the statements concerning the structural integrity of the property because plaintiffs had a written contractual right to sue if the roof, walls, and foundation were not water-leakage free.[8]

¶ 117    As a final matter, we do not agree with plaintiffs' contention that the payment to Court and Obloy constituted fraud, nor did Obloy's changing of the acquisition price on his financial projection spreadsheet constitute fraud. Plaintiffs claim that, had they been aware of the payments to Court and Obloy and Obloy's altering of his financial projection, they would have been more skeptical of what was being promised by defendants. However, as noted, there was no "deal" in place for Peak Construction to perform renovations on the property because there was no meeting of the minds between Peak Construction and plaintiffs as to the scope of work. Thus, plaintiffs' skepticism, or lack thereof, does not impact the existence of a fraud claim.

¶ 118                              CONCLUSION

¶ 119    The trial court properly granted summary judgment in defendants' favor because there was no meeting of the minds regarding the scope of work to be performed by defendants and plaintiffs did not reasonably rely on defendants' representations.

¶ 120    Affirmed.

---

[8]Indeed, count III of the instant complaint, not at issue on appeal, was against 842 Wood, the seller, for breach of the warranty contained in the purchase contract.