NOTICE
Decision filed 11/01/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210409-U

NO. 5-21-0409

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| DOUGLAS REIMER and DENNIS REIMER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Shelby County. |
| | ) | |
| v. | ) | No. 13-CH-8 |
| | ) | |
| PURA VIDA HOLDINGS, INC., DONALD REIMER, | ) | |
| DAVID REIMER, and REIMER DEVELOPMENT, INC., | ) | Honorable |
| | ) | Martin W. Siemer, |
| Defendants-Appellees. | ) | Judge, presiding |

---

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's orders of May 22, 2020, and November 9, 2021, as they relate to trial court case No. 13-CH-8, were not against the manifest weight of the evidence and are affirmed. Following a *de novo* review of the trial court's order of August 28, 2019, it is affirmed.

¶ 2    This appeal follows two orders entered on May 22, 2020, and November 9, 2021, by the circuit court of Shelby County finding in favor of the defendant-appellee, Donald Reimer, and against the plaintiffs-appellants, Douglas Reimer (Douglas) and Dennis Reimer (Dennis). Additionally, Douglas and Dennis appeal the order of August 28, 2019, granting the motion for summary judgment on the issue raised in plaintiffs-appellants' motion for disqualification of attorneys. For the following reasons, we affirm the trial court's orders of August 28, 2019, May 22, 2020, and November 9, 2021, as they relate to trial court case No. 13-CH-8.

1

¶ 3                                    I. BACKGROUND

¶ 4     Shelby County case No. 13-CH-8 was initiated by Douglas and Dennis when they filed a complaint for declaratory judgment against Pura Vida Holdings, Inc. (Pura Vida), Donald Reimer (Donald), David Reimer (David), and Reimer Development, Inc. (RDI) on March 11, 2013. Previously, Shelby County case No. 12-CH-58 had been initiated by Pura Vida when it filed a complaint for declaratory judgment to quiet title pursuant to section 2-701 of the Code of Civil Procedure (735 ILCS 5/2-701 (West 2012)) against Judy Reimer (Judy) and all unknown owners, non-record claimants, occupants, heirs and legatees on October 15, 2012. Pura Vida filed a motion to dismiss or, in the alternative, to consolidate 13-CH-8 with 12-CH-58 because the two actions involved a common nucleus of operative facts, the same events, parties, property, and witnesses. By agreement of the parties, the trial court consolidated the two cases by docket entry on July 29, 2014.

¶ 5     Although these matters were consolidated by the trial court, the claims, testimony, and evidence are not so closely related that we can analyze them as one. Accordingly, we will examine the issues raised in 13-CH-8 in this appeal, No. 5-21-0409,[1] and those raised in 12-CH-58 in appellate case No. 5-21-0408.

¶ 6                        A. 13-CH-8: Cause of Action Alleging Fraud

¶ 7     The original complaint filed in 13-CH-8 sought an order declaring that the shares of stock for Pura Vida be equally divided between Donald, Douglas, and Dennis, and that an order be entered directing David and Donald to execute a warranty deed transferring property, identified in

---

[1]Appellants' brief asserts the following four issues are presented for review: I. Whether the trial court erred in denying the motion for disqualification? II. Whether the trial court erred in failing to consider Edward Heck's deposition transcript contents as proof of value of 18 acres? III. Whether the trial court erred in ruling in favor of the defendant in 13-CH-8; and IV. Whether the trial court erred in ruling in favor of the plaintiff in 12-CH-58? Issues I, II, and III are related to 13-CH-8 and are addressed in this order. Issue IV, regarding 12-CH-58, is addressed in appellate case No. 5-21-0408.

exhibits to the complaint, to Pura Vida. Several amended complaints were filed throughout the course of ligation in 13-CH-8. At the time of trial, count I of the fourth amended complaint (complaint) was the only remaining count, and it was brought by Douglas and Dennis against Donald alleging fraud.

¶ 8    The complaint alleged that at all relevant times, Donald was the president of RDI and David was the sole shareholder of RDI. It further alleged that a complaint to foreclose a mortgage was filed by Prairie National Bank (PNB) against RDI and David on January 29, 2009, in Shelby County case No. 09-CH-3, and a judgment of foreclosure of mortgage was entered in that matter on May 24, 2010, in favor of PNB and against RDI and David. The judgment of foreclosure established the debt owed by RDI and David to PNB as $752,832.42 plus interest and costs.

¶ 9    The complaint stated that RDI owned assets, including a mobile home park in Shelbyville, Illinois, known as the Lake Shelbyville Mobile Home Park (park), and that to prevent a foreclosure sale of the park and/or liquidation of RDI's assets, Donald, as president of RDI, sought a new mortgage loan from First National Bank of Nokomis (First National) to pay the foreclosed mortgage loan from PNB. First National refused to make a loan to RDI, Donald, and David.

¶ 10    Following the refusal by First National, Donald contacted his two other brothers, Douglas and Dennis, to seek their participation in obtaining a loan. The complaint alleged that to "induce the plaintiffs [Douglas and Dennis] to participate in a new loan Donald promised to create a new corporation, Pura Vida, into which the assets of RDI would be transferred, that Pura Vida would be the primary business entity going forward after obtaining the loan, and that Donald, Douglas, and Dennis would be equal one-third shareholders of Pura Vida." Douglas and Dennis would each make personal guarantees of the new loan being sought from First National in exchange for

3

becoming one-third shareholders of Pura Vida. They alleged that they perceived one-third ownership of Pura Vida to be an appropriate exchange for their personal guarantee of the loan.

¶ 11    The complaint further stated that at nearly the same time that Donald was inducing Douglas and Dennis to participate in the new loan, he prepared a business plan for Pura Vida which stated that Donald would be the 90% shareholder of Pura Vida and Douglas and Dennis would each be 5% shareholders. Accordingly, they alleged that Donald's inducement to Douglas and Dennis of one-third ownership of Pura Vida was false.

¶ 12    Douglas and Dennis alleged they were entitled to rely and did rely upon Donald's inducement of each receiving a one-third ownership interest in Pura Vida, and that such reliance was "justified because at the time such new loan was sought, Donald was the president of RDI, was president of Pura Vida, and was in personal contact with the prospective lender, First National." Douglas resided in the St. Louis metropolitan area and Dennis resided in the Washington, D.C. metropolitan area. Douglas and Dennis claimed they were "too far removed from Shelbyville and Nokomis, geographically, to do anything else other than rely on the inducement made by Donald who resides in or adjacent to Shelbyville."

¶ 13    The complaint alleged that Donald did not provide the Pura Vida business plan to Douglas or Dennis, but that it was offered to First National. With the addition of more security, including the personal guarantees from Douglas and Dennis, First National made the loan on June 25, 2010, in the amount of $763,459. The loan was used, in large part, to pay the debt owed by RDI and David to PNB, and a release of the judgment of foreclosure was entered on July 2, 2010.

¶ 14    Douglas and Dennis asserted that despite the inducement by Donald that each would receive one-third ownership of Pura Vida in exchange for their personal guarantees for the new

loan from First National, Donald issued no stock in Pura Vida to Douglas or Dennis. Instead, Donald issued 100% of the stock in Pura Vida to his wife, Corrin Reimer.

¶ 15    Douglas and Dennis stated that by relying on Donald's inducement and granting their personal guarantees, they bound themselves to personal liability for repayment of as much as the entire $763,459 loan and any accrued interest and costs and they did not receive one-third ownership in Pura Vida or anything else of value in exchange for such guarantee. Further, they asserted that each of them was required to have a security clearance as part of their employment and that said "security clearance may or will be revoked if he receives no asset such as one-third ownership in Pura Vida after it is more than a shell and is funded by receipt of the property held by RDI to set off against personal liability for as much as the entire $763,459 loan and any accrued interest and costs." Additionally, they each alleged that their personal guarantees of the loan significantly diminished their net worth and creditworthiness.

¶ 16    Donald's answer to count I of the fourth amended complaint admitted some of the allegations which provide a factual background and denied the allegations of fraud. Additionally, Donald filed affirmative defenses that stated that assuming the allegations of Douglas and Dennis were true, there was no reasonable reliance, and they suffered no damages. A review of the record on appeal reveals that no response to the affirmative defenses was filed.

¶ 17    The first day of the consolidated bench trial took place on November 13, 2018. The parties present on that date were: Donald, Judy, Douglas, and Dennis. As the bench trial was consolidated for separate causes of actions with different burdens of proof, the parties agreed to a waiver of the order of proof and scope. Additionally, they agreed that the plaintiffs-appellants, Douglas and Dennis, would proceed with their case-in-chief in the matter of 13-CH-8 first. Then, the plaintiff, Pura Vida, would present its case, followed by rebuttal from any party, as needed.

¶ 18    David was the first witness to testify. He was called as an adverse witness. The following relevant testimony was presented to the trial court. David testified that in 2005 he was the sole shareholder of RDI and the officers were David, James, and Judy. At this time, RDI owned rental properties, including the park.

¶ 19    In 2007, David signed a mortgage with PNB, after his father, James F. Reimer (James), approached PNB for the loan. In 2007, the officers of RDI were David, Judy, and Donald. At some point in 2007, the loan with PNB became delinquent and a foreclosure action was filed by the bank.

¶ 20    David testified that as the foreclosure matter was ongoing his brother, Donald, and father, James, both looked into different types of financing for the corporation and the property. David did not participate in those negotiations, but he did provide a financial statement and his credit score to Edward Heck, president of First National. A loan was made in June of 2010, for approximately $760,000. The collateral for the loan included the park, some additional rental property real estate, equipment, and Donald's home, and Douglas and Dennis signed as guarantors. It was David's understanding that RDI obtained the loan from First National and those funds were used to pay the PNB mortgage that was in foreclosure. David did not know whether there were any proceeds left after paying PNB.

¶ 21    David did not participate in any discussions with Douglas or Dennis regarding them serving as guarantors, but he believed his father, James, did. David did not know if Donald had any conversations with Douglas or Dennis regarding them serving as guarantors.

¶ 22    David agreed that he did not actively participate in the management of RDI and only held the shares. His father James "mainly oversaw most of it," and his brother, Donald, worked in the park to keep it up as David was working out of state for his employment with Boeing.

6

¶ 23    David testified that he loaned his personal funds to RDI. He estimated he had loaned over $50,000 total over the course of four or five years. He testified that James requested money from him both on behalf of RDI and in a personal capacity. Neither party stipulated what the funds were to be used for.

¶ 24    A business plan for the park was presented to David. He testified that he did not participate in generating the document, did not know the purpose it was generated for, nor who generated it.

¶ 25    David testified that after the First National loan was obtained, Douglas, Dennis, and James requested that he transfer shares from RDI to Pura Vida; however, David refused to make the transfer. David was not aware of any agreement made prior to the First National loan regarding transferring the shares. He testified that he believed James made the statement to his brothers, Donald, Dennis, and Douglas, regarding transferring the shares.

¶ 26    David testified that at the time of trial he was a shareholder and one of the directors of RDI. He also testified that he has served as an officer, in the role of secretary, for Pura Vida since sometime in 2012, 2013, or 2014. The other officers in Pura Vida were Donald and Corrin Reimer.

¶ 27    In 2012, David and Donald removed Judy as secretary for RDI. At this time, David was still the sole shareholder and Donald was the president of RDI. In 2012 or 2013, the ownership interests in RDI were split equally in thirds between David, Donald, and Willard Diener. Around this same time, a loan was obtained from Crossroads Bank that paid off the First National loan. He stated this was done to "get my brothers out as guarantors." Mr. Diener invested $250,000 into RDI so trailers could be purchased in exchange for his one-third ownership of the shares.

¶ 28    Dennis was the next witness to testify, and the following relevant information was presented to the trial court. Dennis has lived in Virginia for the past 18 years, and he has been employed by the Department of Homeland Security for the past 9 years.

¶ 29    Dennis testified that in 2010 he was approached by Donald, his brother, and James, his father, concerning guaranteeing a mortgage for RDI. He testified that he initially received a phone call from James who requested to borrow $10,000 to pay attorneys in order to secure the park. Dennis testified he also had a follow up conversation with Donald, and that Donald was calling him "in an individual capacity as my brother." Dennis did loan the $10,000 to either James or Donald, but he did not recall to whom the money was provided.

¶ 30    In late March or early April 2010, Dennis stated he was contacted by Donald and they discussed a new corporation and repaying the $10,000 loan. Dennis testified that he was approached about being a guarantor within a corporation for a loan with a new bank because of financial trouble with PNB and that a loan was needed in order to secure the park. Dennis testified he declined this request in early 2010 and that "I did not want to do business with [Donald]." He elaborated that he was not interested in doing business with Donald because previously, in 2005, he "loaned them *** $60,000, and that they'd never paid me back for that either."

¶ 31    Dennis testified that after he initially declined to sign the guarantee that Donald contacted him again and this time offered him a one-third share in Pura Vida so he would have assets and the loan could be paid back from the profits of the park. He stated that he did not have anything to do with the corporation of Pura Vida, but that he thought the park, an asset of RDI, would be transferred to Pura Vida. Dennis testified that this was his understanding from talking with Donald. Prior to depositions related to this litigation, Dennis had not seen any documents that demonstrated the alleged agreement to transfer property from RDI to Pura Vida.

¶ 32    Dennis also discussed a conversation he had with his other brother, Douglas, regarding the loan. He testified that "[Douglas] called me and said, 'Look, we're going to be equal shareholders.' And so he convinced me to go in with [Donald] and with [Douglas] and myself. Because he said

8

the stock will be split three ways so there's no way of one of [*sic*] just going off and doing something stupid." After testifying to the foregoing, Dennis testified, "That's a quote originally from [Donald] to me to my wife, yeah. ***And then [Douglas] repeated that to me."

¶ 33    Dennis testified that he did ultimately decide to serve as a guarantor after he "saw the corporate resolution and it showed both [Donald], [Douglas], and myself listed as officers in that corporation." The corporate resolution Dennis saw was for Pura Vida and it was signed in June 2010. Dennis testified that he signed the corporate resolution and returned it to Donald and the bank. Donald told Dennis the bank needed the corporate resolution in order to secure the loan to Pura Vida. There was a separate document that Dennis signed for the bank as guarantor.

¶ 34    Dennis was presented with defendant's exhibit 14, the corporate resolution of Pura Vida. He testified that the document stated "that the corporation will purchase from [RDI] certain real property, which it lists the real estate property, which my understanding was the mobile home park. And that we would be entering into a loan agreement under Pura Vida with First National Bank of Nokomis." Dennis signed the resolution on June 18, 2010, in Virginia, and Donald and Douglas signed a separate document on June 25, 2010. Dennis's understanding was that the assets would be transferred from RDI to Pura Vida. He did not have any reason to question Donald as to whether the assets would be transferred "[p]artly because he's my brother, and also I saw documents that conveyed to the fact that, you know, we were going to enter into this agreement."

¶ 35    Dennis testified that he signed as guarantor for the new loan because he was to receive a one-third interest in Pura Vida and be repaid the $70,000 he had previously loaned, and he would not have agreed to sign as guarantor without these assurances. At the time he agreed to sign as guarantor, the only RDI asset that Dennis was aware of was the park.

9

¶ 36 Following the corporate resolution regarding the loan discussed above, Dennis testified that the other time he participated in a corporate resolution for Pura Vida was "I believe it was 2012, that my father came to me and said, 'We need to set up the corporation.' " Dennis testified that he was listed as an officer of Pura Vida, but that he never attended meetings or anything else to participate in the management of Pura Vida.

¶ 37 Dennis initially testified that the $760,000 loan, for which he signed as a guarantor, impacted his security clearance for his employment. He stated that when reviewing his clearance, a search for debts is conducted. He was told that a default on the loan could impact his security clearance. Dennis later testified that the bank never took any adverse action against him on the loan and neither did his employer. He stated, "The loan at First National Bank did not have any effect on my security clearance."

¶ 38 On cross-examination, Dennis reviewed defendant's exhibit "B," a letter dated August 30, 2005, on letterhead from Reimer Estates, Inc. (REI) written to him and signed by "Dad." Dennis testified that the $60,000 loan he made was to REI, and that corporation no longer exists after it went through bankruptcy. Dennis testified he indicated the loan of $60,000 was to be a personal loan to Donald and his father not a corporate loan. When asked if the obligation to repay the loan survived bankruptcy, Dennis testified that "I believe family is stronger than court. That's what I believed at the time; that's what I believe now."

¶ 39 Prior to signing the guarantee, Dennis did not request to review any documents from RDI or Pura Vida. He testified that "I trusted my brother. *** I didn't ask because I felt like he was gonna put it all together."

¶ 40    Douglas was the next witness called to testify. He testified that he resides in Chesterfield, Missouri. He has been employed in a sensitive government position for the past 10 years and prior to that he was in the military.

¶ 41    Douglas did not have any interest in RDI as a shareholder, officer, or director. He did have knowledge of the workings of RDI because he would assist with maintenance projects on the weekends. He did not have knowledge of the running of the business, including the income and assets.

¶ 42    In March or April of 2010, Douglas stated he received a telephone call from his brother, Donald, regarding needing assistance for obtaining a loan. He explained the loan was needed to refinance the park and other assets that RDI had. RDI had a loan being foreclosed on with PNB, and it was coming to a critical stage. Douglas testified that he initially declined to assist with the loan.

¶ 43    Approximately three months later, Douglas agreed to assist with obtaining the new financing. Douglas testified that "[Donald] sold me on the idea by saying that Reimer Development had substantial K-1's, which was something that I could use to reduce my tax burden. He also said that I would own a third of the assets of a new corporation. And that's how I sold it to my wife." He was told that RDI was going to be dissolved and a new corporation created called Pura Vida.

¶ 44    Douglas stated that he saw several businesses plans during the course of negotiations. One plan showed only Douglas and his wife would have 100% ownership of the new corporation. He believed he saw this plan in late 2009 or early 2010.

¶ 45    Douglas agreed to sign as guarantor and to attend the closing of the loan. Prior to that, he had discussions with Edward Heck because he needed financial statements and tax returns. Douglas also stated he had a discussion with "[Edward Heck] on what was going to happen." It

11

was explained to Douglas by Heck that he could be responsible for the entire loan if it was defaulted on.

¶ 46    Sometime in 2014, Douglas stated he received notices of delinquencies on the loan. He and Dennis discussed making payments to bring the loan current, but they did not make any payments on the loan. The next notice that Douglas received from the bank was that the loan had been paid off and he was relieved of his personal guarantee.

¶ 47    Douglas self-reported the three-month delinquency on the loan to his employer. As a result he was required to undergo a counterintelligence polygraph. He felt he was highly scrutinized at work; however, he did not testify to any other adverse consequences.

¶ 48    At the time of the loan closing, Douglas requested a copy of all the documents from Heck. He did not make any requests for documents to Donald. When asked if he had any reservations prior to signing the guarantee, Douglas stated, "Well I was kind of—I was hesitant that day when I drove up because we hadn't—we hadn't got a new business plan and I hadn't got any real guarantees from [Donald] that I was going to get stock transfers. When I asked him about the business plan that day, and he told me that he was too busy to get it done and he'll do it later."

¶ 49    Douglas testified that as of the time of trial that he believed the promise of the one-third share to him and the one-third share to Dennis was false when it was made. Douglas concluded that he and Dennis "were set up," and Donald made the promises "with the intent that he not provide you with that one-third interest."

¶ 50    A recess of the proceedings was taken with the intent to continue the following day. The next morning, on November 14, 2018, counsel for Douglas and Dennis made a motion to continue the consolidated bench trial so they could file a written motion for disqualification of attorneys. The bench trial was continued over the objection of counsel for Donald.

12

¶ 51    The second day of the bench trial was conducted 14 months later on January 28, 2020. On the record, counsel for Douglas and Dennis indicated an agreement had been reached between the parties regarding providing the discovery deposition of Edward Heck in lieu of his live testimony. The trial court stated, "That discovery deposition, with all exhibits, will be admitted into evidence as his testimony in lieu of his live testimony. A complete copy of that deposition and transcripts to be on record within seven days. Once that is submitted, I will go on the assumption it is being submitted by agreement, and that any discussions or issues regarding the contents have been resolved prior to its submission to the clerk."

¶ 52    Next, Pura Vida, plaintiff in 12-CH-58, began the presentation of testimony regarding the allegations in its complaint. Only that testimony relevant to 13-CH-8 will be presented in this order.

¶ 53    Donald was the next witness to testify. He testified that he was self-employed by RDI and engaged in the buying and selling of mobile homes and the management of a mobile home community.

¶ 54    Donald testified he was also the president of Pura Vida. He stated Pura Vida was incorporated on June 16, 2010, and he has served as the president since that time. At the time Pura Vida was created, it issued 1000 shares. Donald was initially the sole shareholder and paid $1000 for the 1000 shares he received. On February 25, 2012, Donald transferred all of his shares to his wife.

¶ 55    Douglas was the secretary of Pura Vida and Dennis was the vice president. On June 16, 2011, they were removed as officers of Pura Vida and Judy was appointed as secretary. Donald testified that numerous phone calls took place between himself, Douglas, Dennis, James, and Judy

13

regarding the change in officers. Donald testified that his brothers did not object to being removed as officers at the time it occurred.

¶ 56    Donald testified that he did not promise to convey one-third of the shares of either RDI or Pura Vida to his brothers. Additionally, he stated that in February 2015, the loan with First National was paid and Douglas and Dennis were released from their guarantees.

¶ 57    All parties rested, and they agreed to submit written closing arguments to the court. The trial court entered its order on May 22, 2020, finding that Douglas and Dennis failed to meet their burden of proof to establish a claim of fraud against Donald. However, due to the consolidation of this action, 13-CH-8, with the matter of 12-CH-58, in which the court found it did not have jurisdiction due to lack of all necessary and indispensable parties, the trial court's order stated, "As 2013-CH-8 and 2012-CH-58 were consolidated and remain consolidated, and as the issues raised in 2012-CH-58 have not been fully disposed of herein, the judgment on issues raised in 2013-CH-8 is not yet final and appealable."

¶ 58    The case of 12-CH-58 was reopened, after the necessary service was obtained, and additional evidence was presented regarding 12-CH-58 only. Following the additional proceedings, the trial court entered a subsequent order on November 9, 2021. That order stated, "With judgment having been previously entered on 05/22/2020 as to the issues raised in the consolidated case, 2013-CH-8, each judgment and order in these consolidated cases are now final and appealable." This timely appeal followed. Additional facts will be presented as necessary in the analysis section of this order.

¶ 59                        B. Motion for Disqualification of Attorneys

¶ 60    On November 21, 2018, Douglas and Dennis filed a motion for disqualification of attorneys in 13-CH-8, seeking to disqualify Donald's attorneys. Donald was represented by Brian Eck of

14

Featherstun, Gaumer, Stocks, Flynn & Eck, LLP (Featherstun firm). In the motion, Douglas alleged that Brian Eck and/or members of the same law firm represented him in prior litigation, namely Shelby County case No. 09-CH-4, Prairie National Bank v. Reimer Properties, *et al.* and David J. Reimer. Attached as exhibit "C" to the motion was a facsimile transmission report that indicated on February 15, 2012, Douglas sent a fax to Brian Eck. Exhibit "D" to the motion is a letter dated March 31, 2012, from Douglas to Brian Eck regarding case No. 09-CH-4. James, who was not a party to either 12-CH-58 or 13-CH-8, filed an affidavit in support of the motion for disqualification averring that "on a Thanksgiving Day at his office in Decatur, Illinois, I met with Jerrold H. Stocks, an attorney with Featherstun, Gaumer, Stocks, Flynn & Eck, LLP, concerning Shelby County Case No. 2009-CH-4."

¶ 61     On January 17, 2019, Donald filed a response to the motion for disqualification and a motion for sanctions regarding the filing of the motion for disqualification. A response to the motion for sanctions was filed on April 17, 2019.

¶ 62     On May 3, 2019, Donald filed a motion for summary judgment and a memorandum of law on the disqualification issue. No response to the motion for summary judgment was filed. Donald's argument was that any issue as to disqualification had been waived due to the passage of time without raising it.

¶ 63     The trial court scheduled a hearing on the motion for summary judgment on July 29, 2019. On that date, on the record, the parties waived oral argument on the motion for summary judgment. Additional facts will be set forth in the analysis section of this order.

15

¶ 64                                    II. ANALYSIS

¶ 65                              A. Judgment on Fraud Count

¶ 66    "The standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence." *Camelot, Inc. v. Burke Burns & Pinelli, Ltd.*, 2021 IL App (2d) 200208, ¶ 50. When sitting as the trier of fact in a bench trial, the trial court makes findings of fact and weighs all of the evidence in reaching a conclusion. *Nokomis Quarry Co. v. Dietl*, 333 Ill. App. 3d 480, 483-84 (2002). "When a party challenges a trial court's bench-trial ruling, we defer to the trial court's factual findings unless they are contrary to the manifest weight of the evidence." *Id.* at 484. When applying this standard of review, we give great deference to the trial court's credibility determinations, and we will not substitute our judgment for that of the circuit court " 'because the fact finder is in the best position to evaluate the conduct and demeanor of the witnesses.' " *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35 (quoting *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 548 (2007)). "A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based on evidence." *Samour*, 224 Ill. 2d at 544. The trial court's findings and judgment will not be disturbed "if there is any evidence in the record to support such findings." *Brown v. Zimmerman*, 18 Ill. 2d 94, 102 (1959).

¶ 67    The trial court's order cited relevant authorities, set forth the requisite burden of proof, and made findings of facts, consistent with its role in a bench trial. The order was approximately 4½ pages in length containing single-spaced text. Due to its length, only portions of the order will be quoted. The order found as follows:

          "In Count I of the Fourth Amended Complaint filed in 2013-CH-8 against Donald, Douglas and Dennis seek damages for fraud. The elements of fraud that must be proven by

                                        16

Douglas and Dennis include: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) made with the intent to induce the other party to act; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from the reliance. *Dloogatch v. Brincat*, 396 Ill. App. 3d 842, 847 (2009); *Abazari v. Rosalind Franklin Univ. of Medicine & Science*, 2015 IL App (2d) 140952.

In a fraud cause of action, fraud is not presumed; rather, the law presumes that transactions are fair and honest. *Avery v. State Farm Auto Ins. Co.*, 835 N.E.2d 801, 856 (2005). The party attempting to prove fraud has a heavy responsibility. *Gordon v. Dolin*, 434. N.E.2d 341, 345 (1982). The parties agree that Plaintiffs, Douglas and Dennis, have the burden of proving all elements by clear and convincing evidence, and this is found here to be plaintiff's burden of proof on a common law fraud cause of action. [Citation.] Proof by clear and convincing evidence requires more than a preponderance of the evidence but does not quite approach the degree of proof necessary to convict a person of a criminal offense. *Estate of Ragan*, 79 Ill. App. 3d 8, 13-14 (1st Dist. 1979)."

¶ 68 The trial court examined each of the five elements of a fraud action in its order. The first required element is a false statement of material fact. "This element encompasses three requirements: the defendant (1) must make a misrepresentation, (2) it must involve a fact, and (3) the misrepresentation must be material." *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 649 (2001). Douglas and Dennis testified that Donald stated that in exchange for guaranteeing the new loan they would each receive a one-third interest in Pura Vida or RDI. Donald denied making this statement. The trial court stated, "Having considered the testimony provided by all witnesses, this court finds that Douglas and Dennis did not meet their burden of

17

proof on this issue. Specifically, this court finds that Donald's testimony on this issue is more credible." The trial court elaborated on this finding and stated that it was troubling that the terms of the alleged promise varied throughout the testimony. After finding that the statement that Douglas and Dennis alleged Donald made, was not actually made, the trial court determined the second element of a fraud claim, knowledge of falsehood of the statement, and third element, intent to induce, were moot.

¶ 69    Next, the trial court examined the fourth element, justifiable reliance. The law does not allow a party "to enter into a transaction with eyes closed to material facts and then claim fraud by deceit." *Id.* at 651. A party asserting fraud must show that they "justifiably relied on defendant's words or silence." *Central States Joint Board v. Continental Assurance Co.*, 117 Ill. App. 3d 600, 606 (1983). "The right to rely depends on consideration of all the surrounding circumstances." *Miller*, 326 Ill. App. 3d at 651. The trial court found, "Assuming the statements were actually made by Donald as claimed, this court would conclude that the guarantees provided by Douglas and Dennis were not provided in reliance on the truth of that statement. Further, even if there [was] reliance, that reliance would not be justified." The trial court pointed to Douglas's testimony regarding his initial hesitance to sign as a guarantor. Douglas also testified it was his family relationship that led him to sign the guarantee. Further, the court found if there had been reliance that it was not justified as neither Douglas nor Dennis sought any written confirmation of the promise to transfer shares and "[v]arious terms of a possible agreement for the transfer of shares in Pura Vida appear through the record."

¶ 70    Finally, the trial court examined the element of damages. Damages are a necessary element of the *prima facie* case for a common law fraud action. *Id.* at 652. The trial court found that Douglas and Dennis failed to meet their burden of proof to establish their damages. They were

18

each seeking damages of one-third of the gross value of assets that were held by RDI that they contend should have been transferred to Pura Vida, and they contended that this would be $223,440 for each of them. Douglas and Dennis asserted that the deposition testimony of Edward Heck was sufficient to satisfy the underlying value of RDI. The trial court found that Mr. Heck, a bank president, did not qualify as an expert to offer testimony to establish the valuation of a corporation or as to the individual assets held within that corporation. The trial court found as follows:

> "Douglas and Dennis point to no other damages suffered. They point to no other calculation for such damages. They experienced no loss in employment or damage to their security clearance. They provided no evidence of having to pay on the guarantees. In fact, it is clear from the record that the loan was paid off entirely without their having to pay any amount towards that guaranteed loan. No competent basis was provided to calculate any damages. Douglas and Dennis have failed to meet their burden of proof on the damages issue."

¶ 71 On appeal, the plaintiffs-appellants point to their disagreements with the trial court's findings as to credibility. They are quick to criticize the trial court, stating, "[I]t seems the trial court is diametrically opposed to logic and human nature." However, the plaintiffs-appellants failed to present any evidence that would make the opposite conclusion clearly evident. There is nothing in the record to indicate that the trial court's findings were arbitrary, unreasonable, or not based on the evidence. On review, we will not substitute our judgment for that of the trial court. *Orlich*, 2012 IL App (1st) 112974, ¶ 35. If we find any evidence in the record to support the trial court's findings, the judgment will not be disturbed. *Brown*, 18 Ill. 2d at 102.

¶ 72 Douglas and Dennis failed to present sufficient evidence to meet their burden of proving each and every element of common law fraud by clear and convincing evidence. They failed to

19

demonstrate the trial court's judgment was against the manifest weight of the evidence. Accordingly, we affirm the trial court's orders of May 22, 2020, and November 9, 2021, as they relate to 13-CH-8.

¶ 73                                    B. Edward Heck's Deposition Testimony

¶ 74    On appeal, the plaintiffs-appellants allege the trial court failed to consider Edward Heck's deposition testimony[2] to establish the value of RDI's assets. They contend this was an abuse of discretion. As the plaintiffs-appellants presented this testimony on the issue of damages of their fraud count, and as we have already examined and affirmed the judgment on the fraud count for other reasons, this issue is moot and will not be addressed further. "As a general rule, courts of review in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998).

¶ 75                                    C. Motion for Disqualification of Attorneys

¶ 76    The trial court granted summary judgment in favor of Donald finding as a matter of law that Douglas and Dennis waived their right to raise the issue of disqualification. Accordingly, the motion for disqualification of attorneys was denied.

¶ 77    "Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43. On appeal, we review the trial court's entry of summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 131-32 (1992). The party "moving for summary judgment bears the initial burden of proof." *Siegel Development, LLC v. Peak*

---

[2]The deposition transcript of Edward Heck's testimony was not included in the record on appeal.

*Construction LLC*, 2013 IL App (1st) 111973, ¶ 109. This burden of proof can be met either by affirmatively showing that some element of the claim must be resolved in favor of the moving party or by establishing an absence of evidence to support the nonmoving party's claim. *Id.*

¶ 78    "A party seeking disqualification based on prior representation must establish the existence of a prior attorney-client relationship and then establish that the prior and subsequent representations are substantially related." *In re Estate of Klehm*, 363 Ill. App. 3d 373, 380 (2006). A three-part test, adopted by our supreme court, is used to determine whether prior and subsequent representations are substantially related. *Id.* "Under the 'substantial relationship' test, the court first makes a factual reconstruction of the scope of the prior legal representation; second, the court determines whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters; and third, the court determines whether the information is relevant to the issue raised in the pending litigation against the former client." *Id.*

¶ 79    Because disqualification is a drastic measure that prevents a party from being represented by the counsel of his choosing, courts should apply it only when absolutely necessary. *Id.* at 377. Additionally, "motions to disqualify are generally viewed with caution since they can be used as a tool to harass opposing counsel." *Id.* "In an effort to discourage tactical gamesmanship, courts have determined that motions to 'disqualify should be made with reasonable promptness after a party discovers the facts which [led] to the motion.' " *Id.* (quoting *Central Milk Producers Cooperative v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992 (8th Cir. 1978)). As such, a motion for disqualification may be denied on the basis of waiver. *Id.* "A party waives any objection to an alleged attorney conflict of interest if it fails to assert that conflict promptly." *International Insurance Co. v. City of Chicago Heights*, 268 Ill. App. 3d 289, 302 (1994).

21

"In determining whether a moving party has waived its right to object to an attorney's representation of an adverse party on conflict of interest grounds in civil cases, courts have considered such factors as the length of the delay in bringing the motion to disqualify; when the movant learned of the conflict; whether the movant was represented by counsel during the delay; why the delay occurred; and whether disqualification would result in prejudice to the nonmoving party." *In re Estate of Klehm*, 363 Ill. App. 3d at 377.

¶ 80    The motion for summary judgment on the issue of disqualification asserted that waiver applied so the motion for disqualification should be denied. When considering a motion for summary judgment, the trial court "has a duty to construe the record strictly against the movant and liberally in favor of the nonmoving party." *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 423-24 (1998). However, affidavits and deposition testimony offered in support or against a motion for summary judgment may not contain conclusions, but evidentiary facts. *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 699 (2003); *Perfection Corp. v. Lochinvar Corp.*, 349 Ill. App. 3d 738, 744 (2004). "Unsupported assertions, opinions, and self-serving or conclusory statements do not comply with Supreme Court Rule 191(a)." *Geary*, 341 Ill. App. 3d at 699.

¶ 81    On review, for purposes of the motion for summary judgment, we will consider the following allegations to be true: (1) an attorney-client relationship previously existed between Douglas and Dennis and the Featherstun firm and Eck regarding 09-CH-4, (2) the issues in 09-CH-4 and issues in the present litigation are substantially related, and (3) in February and March of 2012, Douglas sent correspondence to Eck. With this in mind, we will next examine whether waiver of the disqualification issue occurred.

¶ 82    The motion for disqualification filed by Douglas contains correspondence he sent to Eck in 2012. The current action, 13-CH-8, was filed on March 11, 2013, approximately a year after

22

that correspondence was sent. Douglas's 2012 correspondence indicates he believed Eck was his attorney.

¶ 83    Eck and the Featherstun firm became involved in 13-CH-8 with the filing of the motion to dismiss, or in the alternative consolidate, on March 18, 2013, on behalf of Pura Vida. The consolidation was later agreed to by the parties at a status conference on July 29, 2014. The plaintiffs-appellants, Douglas and Dennis, knew or should have known of the involvement of Eck and the Featherstun firm at this time.

¶ 84    Throughout this litigation, Douglas and Dennis have been represented by counsel. Neither Douglas nor Dennis alleged that they were unaware of the conflict prior to the first day of the bench trial. Rather, their motion for disqualification states as follows:

> "24. That on the first day of the bench trial in the consolidated cases of 2013-CH-8 and 2012-CH-58 Eck presented Doug with an exhibit which provided Doug with written evidence of a conflict of interest arising by Eck's representation of Donald Reimer and David Reimer.
>
> 25. That that [*sic*] this presentation provided the impetus for the records search which revealed the copy of the check which was shown to the Court and Eck prior to the beginning of testimony on the second day of the bench trial in the consolidated cases of 2013-CH-8 and 2012-CH-58."

They offer no reason why, if concerned about a conflict, even without the alleged "written evidence," this was not presented to the trial court earlier. The motion for disqualification was addressed for the first time on November 14, 2018, what was to be the second day of the bench trial.

¶ 85     While considering all of these facts in the light most favorable to Douglas and Dennis, a delay of more than four years in this contentious litigation is not reasonable and results in waiver of any argument of disqualification. Accordingly, we affirm the trial court's order of August 28, 2019.

¶ 86                                        III. CONCLUSION

¶ 87     For the foregoing reasons, we affirm the trial court's orders of August 28, 2019, May 22, 2020, and November 9, 2021, as they related to 13-CH-8.


¶ 88     Affirmed.