2025 IL App (1st) 240600-U

No. 1-24-0600

Order filed May 16, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| RACHEL L. GREENSPAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 L 4509 |
| | ) | |
| TRACY GORDON and LYLE GORDON, | ) | Honorable |
| | ) | John J. Curry, Jr., |
| Defendants-Appellees. | ) | Judge presiding. |

_____

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Because there are genuine issues of material fact as to whether defendants fraudulently misrepresented the nature of water issues in their basement and fraudulently concealed standpipes—a flood prevention tool in which a tall PVC pipe is installed into a floor drain—from plaintiff, we reverse the circuit court's grant of defendants' motion for summary judgment and remand for further proceedings.

¶ 2    After plaintiff, Rachel L. Greenspan, purchased a residence from defendants, Tracy and

Lyle Gordon, Greenspan's basement flooded multiple times. Believing that the Gordons had not

been forthright in their Residential Real Property Disclosure Report and they intentionally removed standpipes—five- or six-foot-tall PVC pipes that had been installed in the Gordons' basement floor drains to prevent flooding—Greenspan sued the Gordons for fraudulent misrepresentation and concealment. On the parties' cross-motions for summary judgment, the circuit court granted the Gordons' motion and denied Greenspan's motion. Greenspan now appeals and contends that the court erred by granting the Gordons' motion for summary judgment. For the reasons that follow, we agree and reverse the court's grant of summary judgment and remand the matter for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4                              A. The Property and Sale

¶ 5     In September 2010, the Gordons purchased a residence located in Highland Park, Illinois. According to an affidavit by Lyle, for the first few years of home ownership, there were no water events in their basement. However, in April 2013, the floor drains in their basement overflowed necessitating that the Gordons purchase a submersible water pump to remove the water. Due to the damage to their personal property, the Gordons submitted a claim to their homeowners insurance company, Liberty Mutual, for over $11,000. Based on calls logs created by Liberty Mutual in connection with the Gordons' claim, one of its adjusters confirmed with Lyle "that there was no other damage to the property besides the flooded basement."

¶ 6     In January or February of 2014, Ravinia Plumbing and Heating Co., Inc., installed two standpipes, sometimes referred to as riser pipes, in the floor drains of the Gordons' basement. Ravinia Plumbing installed threaded inserts in the drains, which allowed PVC pipes approximately five or six feet tall to connect to the drains. These pipes, which were removable, raised the overflow level necessary to cause flooding in the basement. When the pipes were removed, the original drain

covers could be placed on the floor drains. In a deposition, Tracy testified that, while the standpipes were removable, they "left them in there all the time." In Lyle's deposition, he testified that, while the original drain covers could be placed back on top of the drains despite the threaded inserts, they "never did because [they] always had the [stand]pipes in." Later in his deposition, Lyle noted that, once the standpipes were installed, "for the most part, they would stay in" with the exception being "[s]ometimes *** in winter" he would remove them "if everything [was] frozen and there was no reason to have them in for precaution." In an affidavit, Lyle averred that he was told he did not need to use the standpipes unless there was "a tangible risk of a major rain storm." Following Ravinia Plumbing's work, according to the Gordons' depositions, they did not have any further water issues in the basement.

¶ 7     In January 2017, the Gordons enlisted a real estate broker to sell their house. According to the Gordons' depositions, when there were showings for their house, they would leave, so they were unsure if the standpipes were installed during the showings. But Tracy added that the standpipes "should have been" installed during those times and could not "see any reason why they wouldn't [have] be[en]."

¶ 8     The following month, the Gordons and Greenspan agreed to a contract for the residence. As part of that contract, the Gordons provided a signed Residential Real Property Disclosure Report, as mandated by the Residential Real Property Disclosure Act (Act) (765 ILCS 77/1 *et seq.* (West 2016)). Therein, the Gordons indicated they were unaware of any material defects that would significantly impair the value of the residence, or jeopardize the health or safety of future occupants of the residence. This included being unaware of any "flooding or recurring leakage problems in the crawl space or basement" and any "material defects in the basement or foundation (including cracks and bulges)." Despite disclaiming awareness of any such issues, Tracy,

according to the Gordons' depositions, handwrote in the margin next to the flooding disclaimer: "Water sepage [*sic*] in basement during huge rainstorm in 2012. No water since then." In Tracy's deposition, she asserted it was her idea to add the handwritten disclosure because she did not "feel comfortable saying there was never any flooding in the basement because" of the big storm they did have. While Tracy conceded to mistakenly writing that the seepage occurred in 2012 instead of 2013, she stated it was her realtor who suggested the term "seepage" and noted her belief that water coming up through a basement floor drain would be considered seepage.

¶ 9    In early March 2017, Greenspan enlisted Steven Johnson of Beneficial Home Inspection Services, Inc., to perform a home inspection of the Gordons' residence. In Johnson's report of his findings, he noted that, in the laundry room of the basement, there were "[s]igns of apparent microbial growth" and the "bottoms of the walls *** are damaged from water," though there did not appear to be an active leak. Johnson remarked that he did not test to determine if the microbial "growth" was a health hazard. Based on the findings in the laundry room, Johnson recommended "a qualified contractor inspect and repair or replace as needed." In a photograph that Johnson took of the affected area and included with his report, there are water stains about three or four inches high on the walls. In another area of the report, Johnson observed that the concrete foundation walls "appear[ed] to be repaired or sealed in areas."

¶ 10    According to an affidavit of Greenspan, the standpipes were never installed in the basement floor drains when she visited the residence and she had no clue about their existence or significance at this point. The Gordons acknowledged in their answer to Greenspan's amended complaint that they did not provide any specific information about the standpipes to Greenspan, and the standpipes were not installed "during a time in which [Greenspan] visited the [p]roperty." Before closing on the residence, according to Greenspan's affidavit, she personally visited the residence,

including the basement, four times—twice before making an offer, once during the home inspection and once on April 3, 2017. The following day, Greenspan closed on the residence, and according to her affidavit, the basement floor drains were covered by their original drain covers upon taking possession of the house. In Lyle's affidavit, he averred that, while Greenspan was under contract to buy the residence, the standpipes were not installed because "there were no major storms requiring use of any stand pipes in the basement."

¶ 11    Three months after closing, a rainstorm caused Greenspan's basement to flood with water coming up to her knees. Following the flood, according to Greenspan's affidavit, she found the standpipes in the corner of the unfinished side of the basement along with other items that the Gordons had left, including paint cans, a dehumidifier and two closet doors. According to Greenspan, this area was not near where the standpipes would have been installed, and because they were among miscellaneous items left by the Gordons, two PVC pipes did not appear to be important. Over the next two years, Greenspan's basement flooded with approximately two inches of water additional times due to rainstorms. Because of the flooding issues, Greenspan spent more than $34,000 to resolve the issues. But, according to Greenspan, this amount did not include the cost to rebuild her basement, which would be an additional $48,750.

¶ 12                                B. The Litigation

¶ 13    In April 2019, Greenspan sued the Gordons (Case No. 19 L 3738). After nearly a year of litigation, Greenspan moved to voluntarily dismiss the lawsuit, which the circuit court allowed without prejudice. Thereafter, in May 2021, Greenspan filed the instant lawsuit against the Gordons for fraudulent misrepresentation and breach of contract. The case was referred to mandatory arbitration and heard by an arbitrator, who found in Greenspan's favor in an amount of

$35,042.95. Greenspan, however, rejected the arbitration award, and the court granted her leave to file an amended complaint, which is the operative pleading in this case.

¶ 14    In Greenspan's amended complaint, she alleged one count of fraudulent misrepresentation. As background to her allegations, Greenspan claimed that, during proceedings on the initial lawsuit, the Gordons, through their attorney, informed her that they submitted a homeowners insurance claim to Liberty Mutual for water damage in September 2014, which was unrelated to the basement. According to Greenspan, the Gordons refused to provide any additional documentation to her thereafter. Greenspan believed the Gordons were not being forthright, and because she knew Liberty Mutual was their homeowners insurance company, she subpoenaed Liberty Mutual for additional records. Greenspan asserted that the Gordons initially attempted to quash the subpoena, but ultimately she obtained evidence that the Gordons had made the April 2013 claim with Liberty Mutual based on water in their basement. This conduct by the Gordons was a microcosm, according to Greenspan, of their alleged conduct and concealment during the real estate transaction.

¶ 15    To this end, Greenspan claimed that the Gordons misrepresented and concealed various water issues in the basement of the residence. Specifically, Greenspan asserted that, despite the Gordons disclosing a water seepage event in 2012 in their Residential Real Property Disclosure Report, there had actually been a flooding event in 2013, as borne out by the Gordons' claim with Liberty Mutual. Greenspan also alleged that, to resolve the water issues in the basement, the Gordons, or the previous owners, had sealed the foundation and installed the standpipes. Greenspan claimed that, despite the importance of the standpipes, the Gordons never told her about them and actively concealed the pipes whenever she or anyone associated with her viewed the property. Greenspan alleged that the Gordons acted in this manner to induce her to purchase their

residence, and she reasonably relied on their actions when doing so. As a result, Greenspan sought compensatory and punitive damages.

¶ 16    In the Gordons' answer to Greenspan's amended complaint, they neither admitted nor denied allegations contained in several paragraphs. Based on the Gordons' answers, Greenspan filed a motion to strike or, in the alternative, deem certain answers as admitted. On August 1, 2023, the circuit court deemed admitted Paragraphs 7 through 10, 12, 13, 32A, 49A, 50A and 52A of Greenspan's amended complaint, but denied the rest of her requested relief, which were similar requests to other paragraphs of her amended complaint.

¶ 17                     C. Cross-Motions for Summary Judgment

¶ 18    In October 2023, the Gordons moved for summary judgment while Greenspan moved for partial summary judgment on the issue of liability. In the Gordons' motion for summary judgment, they contended that, based on the undisputed facts, Greenspan could not show they made any false statements of material fact relative to the water in the basement because they affirmatively disclosed that there had been water in the basement following a rainstorm and using the term seepage nevertheless alerted her to the previous water issue. By doing so, according to the Gordons, the onus was on Greenspan to undertake the necessary diligence to investigate the condition further. The Gordons also argued that there was no evidence of active concealment because the affidavit of Lyle showed that the standpipes were simply not needed, and thus not installed, when Greenspan viewed the residence. In Greenspan's motion for partial summary judgment, relying in part on the circuit court's order that deemed admitted several allegations of her amended complaint, she contended that the undisputed facts showed she established the elements of fraudulent misrepresentation, including fraudulent misrepresentation by concealment of material facts.

¶ 19     The following month, the circuit court entered an order denying Greenspan's motion for partial summary judgment and granting the Gordons' motion for summary judgment. In the order, the court found "there is no genuine issue of material fact in this cause and that defendant[s] [are] entitled to judgment as a matter of law" without further explanation. In the same order, the court modified the portion of its August 1, 2023, ruling that had deemed admitted certain allegations of Greenspan's amended complaint "to reflect that the substantive portions of the answers to Paragraphs 49A, 50A, and 52A of the Amended Complaint were denied by Defendants."

¶ 20     Thereafter, the Gordons filed a petition for $8750 in attorney fees pursuant to Cook County Circuit Court Rule 25.11(d) (amended Apr. 1, 2021), which allowed the Gordons to seek compensation from Greenspan for their reasonable legal fees incurred from the arbitration because she had rejected the arbitration award and failed to obtain a better result at trial. The circuit court granted the Gordons' petition. While Judge John J. Curry, Jr., presided over the majority of the case, including the cross-motions for summary judgment, Judge Patrick J. Sherlock, as the supervising judge for mandatory arbitration, entered the order on the fee petition pursuant to Cook County Circuit Court Rule 25.11(e) (amended Apr. 1, 2021). This appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22     Greenspan contends that the circuit court erred in granting the Gordons' motion for summary judgment where the record shows there are genuine issues of material fact.

¶ 23     Initially, however, we must address two preliminary issues. First, the Gordons assert that Greenspan's brief violates Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) for containing a statement of facts with argument. We agree with the Gordons that her brief does contain improper argument in her statement of facts, but we do not find the violations to be so egregious that they hinder our review of the issues on appeal. Consequently, we will disregard any such statements in

violation of Rule 341(h)(6), but will otherwise address Greenspan's contentions on appeal. See *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 21 (where the plaintiff's Rule 341(h)(6) violations were not "so egregious that they hinder[ed] [the appellate court's] review of the issues raised on appeal," the court "simply disregard[ed] any improper or unsupported statements").

¶ 24    Second, in Greenspan's opening brief, she seems to take issue with the circuit court's modification of its order that had deemed admitted certain allegations of her amended complaint. However, in Greenspan's reply brief, she posits that she is not arguing for reversal based on the court's modification. We take this concession in Greenspan's reply brief as a waiver of any argument over the propriety of the court's modification order, and therefore, we do not address it.

¶ 25    With those preliminary issues resolved, we turn to the circuit court's rulings on the parties' cross-motions for summary judgment. We further note that, in her opening brief, Greenspan asserts that she is not claiming the court erred in denying her motion for partial summary judgment, thereby waiving any such argument. Rather, Greenspan contends that the court erred by granting the Gordons' motion for summary judgment.

¶ 26    Summary judgment is proper where the pleadings, depositions, affidavits, and admissions on file demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25. The purpose of summary judgment is not to resolve a question of fact, but rather to determine if one exists. *Lewis v. Lead Industry Ass'n*, 2020 IL 124107, ¶ 14. A genuine issue of material fact "exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. When determining whether a genuine issue of material fact exists, we construe "the

evidence in the light most favorable to the nonmoving party and strictly against the moving party." *Johnson v. Armstrong*, 2022 IL 127942, ¶ 31. This includes drawing any reasonable inferences in favor of the nonmoving party. *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 106. The disposition of litigation on "[s]ummary judgment is a drastic measure," and such a motion "should only be granted if the movant's right to judgment is clear and free from doubt." *Seymour v. Collins*, 2015 IL 118432, ¶ 42. We review the court's grant of summary judgment *de novo. Id.*

¶ 27 The allegations from Greenspan's amended complaint against the Gordons are based in fraud. "Fraud may be perpetrated by fraudulent misrepresentation or by fraudulent concealment." *Chatham Surgicore, Ltd. v. Health Care Services Corp.*, 356 Ill. App. 3d 795, 803 (2005). And here, Greenspan's two overarching allegations touch upon each type. Her allegation about the Gordons' disclosure of water seepage on the Residential Real Property Disclosure Report sounds in fraudulent misrepresentation. Her allegation about the Gordons' concealment of, and silence about, the standpipes sounds in fraudulent concealment. While both types of fraud are similar, their elements are slightly different. See *Bauer v. Giannis*, 359 Ill. App. 3d 897, 902-03 (2005).

¶ 28                              1. Fraudulent Misrepresentation

¶ 29 We start with Greenspan's claim about the Gordons' disclosure of water seepage on the Residential Real Property Disclosure Report. Before addressing the elements of a fraudulent misrepresentation claim, we must briefly discuss the Act, which governs the Residential Real Property Disclosure Report. 765 ILCS 77/1 *et seq.* (West 2016). Although Greenspan has not alleged a violation of the Act itself, likely because its one-year statute of limitations (see *id.* § 77/60) had expired by the time she first filed suit against the Gordons, the basis of her fraudulent misrepresentation claim is that the Gordons made a false statement on the Residential Real Property Disclosure Report. The Act mandates that a seller of real estate in certain instances, here

included (see *id.* §§ 77/10, 15), disclose "material defects" of which he or she has "actual knowledge" on a myriad of different aspects of a property, including "flooding or recurring leakage problems in the crawl space or basement" and material defects "in the basement or foundation (including cracks and bulges)." *Id.* § 77/25(b), 35.

¶ 30    The Act defines a "material defect" as "a condition that would have a substantial adverse effect on the value of the residential real property or that would significantly impair the health or safety of future occupants of the residential real property unless the seller reasonably believes that the condition has been corrected." *Id.* § 77/35. Moreover, the Act provides that a seller is not liable if he or she made an error on the form "based on a reasonable belief that a material defect or other matter not disclosed had been corrected." *Id.* § 77/25(a)(ii). Despite the obligations and corresponding liability provided for by the Act, the statute was "not intended to limit remedies or modify any obligation to disclose created by any other statute or that may exist in common law in order to avoid fraud, misrepresentation, or deceit in the transaction." *Id.* § 77/45. In turn, a plaintiff may "seek recovery for fraudulent misrepresentation based solely on a disclosure made" on the Residential Real Property Disclosure Report. *Rolando v. Pence*, 331 Ill. App. 3d 40, 46 (2002).

¶ 31    There is strong evidence in the record that, with the standpipes installed in the basement floor drains, the Gordons had a reasonable belief that any water issues that existed previously in the basement had been corrected. However, they never qualified the disclosure that there was no current flooding or recurring leakage in the basement by the fact that standpipes had been installed since January or February of 2014. Indeed, as discussed later in this decision, there is a claim that they fraudulently concealed the existence of the standpipes. In addition, the Gordons added a handwritten disclosure about "[w]ater sepage [*sic*]" in 2012 and no water since then. These two representations form the basis for Greenspan's claim of fraudulent misrepresentation. See *id.*

¶ 32    Turning now to the elements of a fraudulent misrepresentation claim, there are five elements that a plaintiff must establish: "(1) a false statement of material fact (2) known or believed to be false by the person making it, (3) an intent to induce the plaintiff to act, (4) action by the plaintiff in justifiable reliance on the truth of the statement, and (5) damage to the plaintiff resulting from such reliance." *Lewis*, 2020 IL 124107, ¶ 30. Because all five elements must be established, the absence of any element will warrant summary judgment. *Id.* ¶ 15.

¶ 33    Notwithstanding the apparent mistake in noting that the water event occurred in 2012 instead of 2013, the Gordons described the water event as merely "sepage [*sic*]." According to the Merriam-Webster Online Dictionary, "seepage" is "the process of seeping," which itself is defined as "to flow or pass slowly through fine pores or small openings." See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/seepage (last visited Apr. 22, 2025); Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/seeping (last visited Apr. 22, 2025). The common meaning of the word "seepage" connotes a small amount of water. Yet, this description stands in contrast to other evidence submitted in conjunction with the parties' motions for summary judgment, including the fact that the Gordons had to remove the water using a submersible water pump and they made an insurance claim with Liberty Mutual for more than $10,000 in property damage.

¶ 34    There are three components to a false statement of material fact: (1) a misrepresentation involving (2) a fact that is (3) material. *Hart v. Boehmer Chevrolet Sales, Inc.*, 337 Ill. App. 3d 742, 751 (2003). Given the familiar connotation of the word "seepage" compared to the amount of the Gordons' insurance claim with Liberty Mutual and their need for a submersible water pump to remove the water, there is evidence that the Gordons' description of the water event was a misrepresentation. Moreover, the amount of water in a water event is certainly a fact. Whether the

Gordons' description of the water event as merely seepage was material requires us to determine whether that description "concerned the type of information upon which a buyer would be expected to rely in making a decision regarding the purchase of the product" or whether the "buyer would have acted differently knowing the information." *Wernikoff v. Health Care Service Corp.*, 376 Ill. App. 3d 228, 234 (2007). The materiality of a fact has to be viewed within the context of the subject matter of the transaction. *Lidecker v. Kendall College*, 194 Ill. App. 3d 309, 316 (1990). In Greenspan's affidavit filed in connection with the motions for summary judgment, she averred that had she known of the true nature of the water event, she might have changed her decision with respect to the property. Additionally, the Gordons' failure to qualify the disclaimer of no flooding or recurring leakage in the Residential Real Property Disclosure Report with the fact that this was because they had standpipes installed was potentially a false statement of material fact. Based on Tracy and Lyle's depositions, following the installation of the standpipes, they did not have another water event in their basement. The logical conclusion is that the standpipes were the reason the Gordons did not have another water event in their basement.

¶ 35    All of this is to say, there is a genuine issue of material fact as to whether the Gordons made a false statement of material fact on their Residential Real Property Disclosure Report by describing the water event as merely seepage or by failing to qualify their disclaimer of no flooding or recurring leakage in the Residential Real Property Disclosure Report with the fact that this was because they had standpipes. See *Napcor Corp. v. JP Morgan Chase Bank, NA*, 406 Ill. App. 3d 146, 154 (2010) (finding the plaintiff presented sufficient evidence at trial that the defendant made a false statement of material fact concerning the condition of the roof on an industrial building to preclude a judgment notwithstanding the verdict where there was evidence the plaintiff's president

would have acted differently had he known the new roof was not a tear-off roof, but rather a new roof built on top of the old roof).

¶ 36    Next, relying on the same evidence from above, there was a genuine issue of material fact as to whether the Gordons knew these statements were false. There is certainly a factual question as to whether the Gordons knew that the standpipes were the reason there had been no flooding since the one water event. In addition, given the apparent inconsistency between their description of the water event as "sepage [*sic*]," as disclosed in the Residential Real Property Disclosure Report, and the amount of the Gordons' insurance claim with Liberty Mutual along with the need for the submersible water pump, as they testified to in their depositions, there is circumstantial evidence from which a trier of fact could conclude that the Gordons knew or believed they made a false statement of material fact in describing the earlier water event as seepage. See *Connor v. Merrill Lynch Realty, Inc.*, 220 Ill. App. 3d 522, 533-34 (1991) (where there was some evidence showing the seller of a house "fail[ed] to disclose the full extent" of flooding issues in the residence's basement, there was a genuine issue of material fact as to whether the seller "knowingly made a false statement regarding the history of the flooding of the basement to plaintiffs" to preclude summary judgment). While there is no direct evidence in this case that the Gordons knowingly made a false statement of material fact, knowledge may be proved circumstantially. *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill. App. 3d 37, 50 (1979).

¶ 37    As to the intent-to-induce element, such an action "can be found from the fact that a person makes a statement knowing it to be false when the statement is made for the purpose of inducing the one to whom the statement is made to act." *Szajna v. General Motors Corp.*, 115 Ill. 2d 294, 322-23 (1986). During Tracy's deposition, she was asked why she decided to handwrite the statement about the water event. She responded that she told her "realtor [she] didn't feel

comfortable saying there was never any flooding in the basement because [they] did have that big storm." One could reasonably view her intent in disclosing the water event as not being done to induce Greenspan, or any other potential buyer, to act, but rather from a place of wanting to be considerate. Yet, as previously referenced, in disclosing the seepage while also that there had been no subsequent water events, Tracy failed to qualify that there was no current flooding or recurring leakage issues because the standpipes had been installed and remediated any potential issues. In turn, another person could reasonably view Tracy's disclosure as providing misleading assurances of a dry basement so that a prospective buyer would contract to buy her and Lyle's residence. Given this, there is a question of fact as to what the Gordons' intent was in making the disclosure.

¶ 38     The penultimate element is whether Greenspan could justifiably rely on the Gordons' failure to qualify the statement that they were aware of no flooding or recurring leakage and the handwritten statement about the water seepage in 2012. It is well established that "a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts." *Schmidt v. Landfield*, 20 Ill. 2d 89, 94 (1960). In determining whether a plaintiff's reliance was justified, we must consider whether he was reasonable in relying on the defendant's "representation in light of the facts within his actual knowledge and any he might have discovered by the exercise of ordinary prudence." *D.S.A. Financial Corp. v. County of Cook*, 345 Ill. App. 3d 554, 560 (2003). Stated otherwise, "[a] person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another." *Chicago Export Packing Co. v. Teledyne Industries, Inc.*, 207 Ill. App. 3d 659, 663 (1990). "When [a plaintiff] is afforded the opportunity of knowing the truth of the representations he is chargeable with knowledge; and if he does not avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by misrepresentations." *Schmidt*, 20 Ill. 2d at

94. Generally, the issue of justifiable reliance is a question of fact. *Siegel Development, LLC v. Peak Construction LLC*, 2013 IL App (1st) 111973, ¶ 114. But, "where only one conclusion can be drawn from the undisputed facts, the question becomes one for the court to determine." *Id.*

¶ 39    Here, we cannot say that, as a matter of law, Greenspan could not justifiably rely on the unqualified statement on the Residential Real Property Disclosure Report or on Gordons' handwritten statement about the water seepage in 2012. The circumstances of this case are important. From the Residential Real Property Disclosure Report, Greenspan knew there had been a water event in the basement a few years before she contracted to buy the residence, but nothing since then. From the home inspection, she knew there was water damage in the basement's laundry room, including a recommendation from the inspector to have a qualified contractor inspect and repair the issue. Though it is ambiguous from our reading of the inspection report whether that suggestion referred to the microbial growth issue or the water damage issue, in Greenspan's affidavit, she claims that the inspector made this suggestion specifically in reference to the mold issue to ensure it was not hazardous.

¶ 40    During oral argument, the question was posed why did Greenspan not ask the Gordons about the seepage or if they had done anything to prevent subsequent water events. See *D.S.A Financial*, 345 Ill. App. 3d at 560 (in determining whether a plaintiff justifiably relied on another's statement in a fraud action, the court must consider any facts the plaintiff "might have discovered by the exercise of ordinary prudence"). It is arguable that Greenspan should have asked these questions. Yet, "[w]ether an injured party justifiably relied upon defendants' words or silence depends on the surrounding circumstances." *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 166 (1986). Under the unique circumstances in this case, it is also possible that, given the home inspector noting in his report that the concrete foundation walls appeared to be "repaired

or sealed" in areas, Greenspan assumed this had remediated the seepage issue and was the reason the Gordons disclaimed that they were unaware of any material defects related to flooding or recurring leakage issues in the basement. These issues go directly to whether Greenspan could have discovered the truth through reasonably inquiry and are questions of fact for the trier of fact to resolve. See *James v. Lifeline Mobile Medics*, 341 Ill. App. 3d 451, 457 (2003) (observing that whether a party utilized ordinary prudence is generally a question of fact to be resolved by the trier of fact). Therefore, whether Greenspan could have justifiably relied on the unqualified statement in the Residential Real Property Disclosure Report or the Gordons' statement about the water seepage is a triable issue of fact.

¶ 41   Finally, there is an issue of fact as to whether Greenspan was damaged by her reliance on the Gordons' unqualified statement in the Residential Real Property Disclosure Report or the disclosure as mere seepage. Greenspan bought the house under the guise of the residence having merely a seepage issue that had been resolved without any specific remediation when, in fact, the water issue was being addressed in an ongoing way by the standpipes and was arguably much more severe than "seepage." Eventually her house flooded, which, according to her, necessitated expensive remediation. Consequently, insofar as the circuit court granted summary judgment in favor of the Gordons based on their statements in the Residential Real Property Disclosure Report, including the handwritten disclosure, there are genuine issues of material fact that should have precluded summary judgment.

¶ 42                              2. Fraudulent Concealment

¶ 43   We now turn to Greenspan's fraudulent concealment allegation against the Gordons based on their alleged silence and concealment of the standpipes. "Intentional concealment of a material fact is the equivalent of a false statement of material fact." *JPMorgan Chase Bank, N.A. v. East-*

*West Logistics, L.L.C.*, 2014 IL App (1st) 121111, ¶ 67. To prove a fraudulent concealment claim, the plaintiff must show the "(1) concealment of a material fact, (2) intent to induce a false belief where there exists a duty to speak, (3) that the other party could not have discovered the truth through reasonable inquiry and relied upon the silence as an indication that the concealed fact did not exist, (4) that the other party would have acted differently had it known of the concealed information, and (5) that its reliance resulted in its injury." *Vandenberg v. Brunswick Corp.*, 2017 IL App (1st) 170181, ¶ 31.

¶ 44    As to the first element, there is no dispute among the parties that the standpipes were integral for resolving the Gordons' previous water issue in the basement, as by their own statements, they had no further water issues after the standpipes were installed. Given their importance, during the Gordons' depositions, both Lyle and Tracy testified that the standpipes were almost always installed with the lone possible exception, according to Lyle, occurring in winter if there was no risk of flooding. However, they both also testified to being unsure what happened to the standpipes during showings of their house, with Tracy even noting that the standpipes should have been installed during the showings and she could not see any reason why they would not have been. Yet, despite the Gordons' insistence in their depositions that the standpipes should have been installed at some point between when they listed their house for sale and the closing, Greenspan, according to her affidavit, never observed them installed the four times she personally visited the residence, including the day before closing. Similarly, there was no mention of standpipes in the home inspection report, and it is reasonable to infer that, had they been installed, the home inspector would have noted them.

¶ 45    All we know conclusively about the standpipes is that, according to Greenspan's affidavit, she found them in the basement three months after closing interspersed with miscellaneous items

left by the Gordons. Where exactly they were located when Greenspan viewed the residence is unknown. From this evidence, one could reasonably conclude that the Gordons did not have the standpipes installed because they were simply not needed. But there is another reasonable conclusion. In light of the Gordons' deposition testimony where they each, at one point, unequivocally asserted that the standpipes were almost always installed, one could rationally conclude that they did not have the standpipes installed because they did not want to turn off a prospective buyer. Whether this was because the standpipes were esthetically unpleasing, their presence would beget more questions about the basement's water issues, or another reason, such a conclusion is reasonable based upon the evidence. Although there is no direct evidence that the Gordons concealed the standpipes, a fraud claim can be based on circumstantial evidence. See *Metropolitan Capital Bank & Trust v. Feiner*, 2020 IL App (1st) 190895, ¶ 40 (citing *Parsons v. Winter*, 142 Ill. App. 3d 354, 359 (1986)). Viewing the evidence in the light most favorable to Greenspan, the record shows a genuine issue of material fact as to whether the Gordons concealed the standpipes from her.

¶ 46    We note that, in an affidavit Lyle submitted in connection with the Gordons' motion for summary judgment, he attempted to foreclose the element of concealment of a material fact from being a triable issue of fact. Therein, Lyle averred that the standpipes were not installed between the time Greenspan contracted to buy their residence and the closing because "there were no major storms requiring use of any stand pipes in the basement." However, such an averment stands in contrast to his and Tracy's deposition testimony where they were equivocal about the standpipes, going from the standpipes being almost always installed to being installed for the most part except if there was no risk of flooding to being unsure if they were installed during showings. "[A] witness' affidavit may expand and clarify opinions, estimates, inferences, and uncertain summary

statements made in a prior deposition as long as the affidavit does not contradict deliberate testimony relating to concrete facts." *Wehde v. Regional Transportation Authority*, 237 Ill. App. 3d 664, 683 (1992). But "a party's later submission of an affidavit inconsistent with that party's deposition testimony will not raise a disputed issue of fact to prevent the entry of summary judgment." *Morris v. Margulis*, 197 Ill. 2d 28, 37 (2001). It logically follows that a party's later submission of an affidavit inconsistent with that party's deposition testimony will not remove a question of fact to aid in the entry of summary judgment. Therefore, Lyle's conclusive averment in his affidavit about the standpipes being uninstalled because there was no risk of flooding cannot preclude a question of fact on the issue of concealment.

¶ 47　As to the intent to induce a false belief where there exists a duty to speak, the defendant necessarily must be "under a duty to disclose" the material fact to the plaintiff. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500 (1996). That duty to disclose may arise out of various situations, including if the parties have "a fiduciary or confidential relationship" or where the "plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Id.* This case does not implicate either situation. See *Dunsmore v. Gallegly*, 2024 IL App (3d) 220431-U, ¶ 17 (where buyers and sellers of real estate were in an arms-length, transactional relationship, there was no special relationship creating a duty to speak based on the mere creation of that relationship). But another situation exists where silence is combined with active concealment. *Henderson Square Condominium Ass'n v. LAB Townhomes, L.L.C.*, 2014 IL App (1st) 130764, ¶ 99, *aff'd* 2015 IL 118139; *Mitchell v. Skubiak*, 248 Ill. App. 3d 1000, 1005 (1993). While "mere silence is quite different from concealment[,] *** [s]ilence accompanied by deceptive conduct or suppression of material facts results in *active*

*concealment* and it then becomes the duty of a person to speak." (Emphasis in original.) *Mitchell*, 248 Ill. App. 3d at 1005.

¶ 48    Here, the Gordons admitted in their answer to Greenspan's amended complaint that they were silent about the standpipes and their function as a flood prevention tool. And based on our previous discussion about how one could reasonably conclude that the Gordons concealed the standpipes from Greenspan, there is a question of fact as to whether the Gordons had a duty to speak. In a similar case, *Dunsmore*, 2024 IL App (3d) 220431-U, ¶¶ 13, 17, the appellate court concluded that, despite the backyard of a residence flooding shortly after buyers purchased the residence from the sellers, the sellers did not have a duty to speak, either based on a special relationship or based on active concealment coupled with silence. *Id.* As to the latter, the appellate court found that the record only indicated that the sellers were silent about the adequacy or inadequacy of the property's drainage issues, and there was simply no evidence that the sellers actively concealed anything with respect to the property's drainage. *Id.* ¶ 13. On the issue of concealment, the appellate court highlighted that the buyers never inquired about damage to a deck in the backyard that might have alerted them to issues with the property's drainage. *Id.* ¶ 16. The court observed that, had the buyers done so and received evasive or deceptive answers, such responses could have evinced active concealment by the sellers. *Id.* In contrast to *Dunsmore*, as previously discussed, when the evidence is viewed in the light most favorable to Greenspan, one could reasonably conclude that the Gordons concealed the standpipes from her. Because of this, Greenspan's failure to inquire about the seepage and its remediation, which potentially could have alerted her to the standpipes, does not impair her claim for fraudulent concealment. And so, because one could reasonably conclude that the Gordons concealed the standpipes from Greenspan

and the Gordons' undisputed silence about the standpipes, there is a question of fact as to whether the Gordons intended to induce a false belief where there was a duty to speak.

¶ 49    Turning now to whether Greenspan could have discovered the truth through reasonable inquiry. This issue is similar to the one discussed in the fraudulent misrepresentation analysis, as there must be justifiable reliance (see *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 709 (2002)), which normally is a question of fact unless only one conclusion can be drawn from the undisputed facts. See *Siegel Development*, 2013 IL App (1st) 111973, ¶ 114.

¶ 50    Based on the circumstances, like with our fraudulent misrepresentation analysis, we cannot say only one conclusion can be drawn from the undisputed facts. The evidence showed that, when the standpipes were not installed in the floor drains, the existing floor drain covers could fit flush on top of the floor drains, thereby obscuring the threaded inserts into which the standpipes attach. As a result, when the standpipes were not installed—which the evidence points to in this case— and with the original floor drain covers on top of the drains, there would be no way to discover the threaded inserts unless someone removed the drain covers, or someone saw the standpipes in the basement and knew their application. The standpipes are not like a sump pump in the middle of a basement that is in the open and obvious. Rather, to discover the threaded inserts in the floor drains where the standpipes connect, one would have to remove the existing floor drain covers. Notably, there is no indication from the report that the home inspector discovered the standpipes or the threaded inserts in the floor drains, and it is reasonable to infer that, had he observed either of them, he would have documented them in his report.

¶ 51    As discussed in relation to Greenspan's fraudulent misrepresentation allegation, it is reasonable to wonder why Greenspan simply did not ask the Gordons about the seepage and if they had done anything to prevent subsequent water events. Indeed, it is arguable that Greenspan

should have asked these questions. Yet, "[w]ether an injured party justifiably relied upon defendants' words or silence depends on the surrounding circumstances." *Zimmerman*, 156 Ill. App. 3d at 166. Under the unique circumstances in this case, as already discussed, it is also possible that, given the home inspector noting in his report that the concrete foundation walls appeared to be "repaired or sealed" in areas, Greenspan assumed this had remediated the seepage issue and was the reason the Gordons disclaimed that they were unaware of any material defects related to flooding or recurring leakage issues in the basement. These issues go directly to whether Greenspan could have discovered the truth, *i.e.*, the need for the standpipes, through reasonable inquiry and are questions of fact for the trier of fact to resolve. See *James*, 341 Ill. App. 3d at 457.

¶ 52    Given the circumstances here, we cannot say, as a matter of law, that Greenspan should have discovered the need to use the standpipes for flood prevention through ordinary prudence. See *Russow v. Bobola*, 2 Ill. App. 3d 837, 842 (1972) (where inadequate drainage led to flooding issues in a residence, the appellate court observed that, "[w]hile it is true that the plaintiffs had a duty of induiry [*sic*] regarding the premises and are chargeable with all knowledge which an examination conducted with ordinary care would provide, the matter undisclosed here is of such a nature that it would not be readily apparent from an inspection of the property").

¶ 53    As to whether Greenspan would have acted differently had she known of the standpipes and whether her reliance resulted in her injury, there is evidence on these elements to withstand summary judgment. In Greenspan's affidavit, she asserted that she would have acted differently had she known of the extent of the basement's water issues, either in attempting to negotiate a lower purchase price or outright cancelling the contract during the due diligence period. From this, it is reasonable to infer that, had Greenspan known of the need to use the standpipes for flood prevention, and necessarily having two approximately five- or six-foot-tall PVC pipes sticking out

of the basement floor drains, she might have acted differently with respect to her purchase of the property. Finally, the evidence suggests that Greenspan's reliance resulted in her injury, *i.e.*, the flooding of her basement. While there is certainly no guarantee that the standpipes being installed would have prevented Greenspan's flooding, their purpose is for flood prevention, and thus, there is a triable issue of fact on this final element.

¶ 54     During briefing on the parties' cross-motions for summary judgment, the Gordons argued that Greenspan could not claim there was an affirmative obligation to keep their basement in a condition that did not reflect its actual state, *i.e.*, keep the standpipes installed at all times even when the weather did not necessitate their installation. According to the Gordons, to require as such would be akin to requiring sellers of a residence to have their air conditioning running in winter to avoid an active concealment of a possible broken condition in the system. The Gordons' comparison missed the mark. That example touches upon, at worst, mere silence by a seller, not active concealment. In the instant case, it is undisputed that the Gordons were silent about the standpipes, but there is more because, when the evidence is viewed in the light most favorable to Greenspan, one could reasonably conclude that the Gordons concealed evidence of the standpipes for whatever reason. In *Mitchell*, 248 Ill. App. 3d at 1005, the appellate court observed that:

>   "Silence accompanied by deceptive conduct or suppression of material facts results
>   in *active concealment* and it then becomes the duty of a person to speak. Under
>   such circumstances, if a party to a contract of sale fails to disclose the whole truth,
>   having the requisite intent to deceive, this amounts to fraud \*\*\*." (Emphasis in
>   original.)

The evidence in this case, when viewed in the light most favorable to Greenspan and strictly against the Gordons, potentially presents the situation discussed in *Mitchell*. Whether or not the

Gordons were forthright in their description of the prior water issue in their basement on the Residential Real Property Disclosure Report, they nevertheless alerted Greenspan to the basement having a previous water issue. Yet, in the same breath, they assured her that the water issue had been resolved, as there had not been any additional events. But in doing so, the Gordons did not disclose to Greenspan the entire truth and remained silent about the apparent critical need to use the standpipes for flood prevention. That silence would not have paved the way for liability on its own. See *Henderson Square*, 2014 IL App (1st) 130764, ¶ 99. But there is evidence from which a reasonable mind could infer that the Gordons were not merely silent about the standpipes, but took steps to actively conceal them from Greenspan, leading to multiple questions of fact precluding summary judgment in this case. Consequently, insofar as the circuit court granted summary judgment in favor of the Gordons based on their alleged concealment of the standpipes, there are issues of fact that should have precluded summary judgment.

¶ 55 In sum, as to the Gordons' conduct, this case, at its core, requires credibility determinations, which a court cannot do on summary judgment. See *Fox v. Food & Drink Chicago, Inc.*, 2024 IL App (1st) 230755, ¶ 53. As to Greenspan's conduct, this case, at its core, involves the reasonableness of her actions in light of what she knew about the property, a question generally that is factual. See *James*, 341 Ill. App. 3d at 457. Accordingly, because there are genuine issues of material fact on Greenspan's allegations of fraudulent misrepresentation and fraudulent concealment such that both allegations should have survived summary judgment, the circuit court improperly granted the Gordons' motion for summary judgment.

¶ 56 Lastly, given our disposition, we also vacate the circuit court's award of attorney fees in favor of the Gordons, as the basis for that award was Greenspan failing to obtain a better result at trial. See Cook County Circuit Court Rule 25.11(d) (amended Apr. 1, 2021).

¶ 57                                    III. CONCLUSION

¶ 58    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County

and remand for further proceedings. We also vacate the award of attorney fees.

¶ 59    Reversed and remanded; attorney fees award vacated.